BOUDREAUX v. LOUISIANA POWER & LIGHT CO.

———

(June 8, 1931. Opinion and Decree.)

———

Beard & O'Keefe and Leslie P. Beard, of New Orleans, attorneys for plaintiffs, appellants.

John May, of New Orleans, attorney for defendant, appellee.

WESTERFIELD, J. The widow and minor children of David E. Stansbury, deceased, bring this action against the defendant, Louisiana Power & Light Company, claiming damages in the sum of $71,115.90 for the alleged negligent killing of their husband and father.

There was judgment below in favor of defendant dismissing plaintiffs' suit, and plaintiffs have appealed.

On August 12, 1930, at about 7:45 a. m., David E. Stansbury, an employee of Frank P. Shadwell, was electrocuted under the following conditions:

Shadwell had contracted to build a bridge across what is known as the "Outfall Canal" on the Behrman highway in Jefferson parish. Preparatory to the execution of his contract Shadwell sent his motortruck, upon which was superimposed a crane, to the vicinity of the proposed bridge. The crane was in charge of a crew composed of a foreman, a crane operator, and four laborers, Stansbury being one of the laborers. The crane on the truck is 36 feet long and is designed to operate a clam shell bucket weighing 2,100 pounds, which, when opened, has a spread of 7 feet. The crane is mounted on the bottom of the truck, 4 feet above the ground. The clam shell bucket is attached to the crane by means of an iron cable. On the morning of the accident with the intention of parking the crane on the side of the road until such time as it would be needed, Shadwell instructed his foreman to unload the clam shell bucket and place it on the extreme right of the roadway. The bucket was thereupon hooked up to the cable and was moved in response to signals of the foreman and crane operator. In the execution of this maneuver Stansbury and several other members of the crew were ordered to take hold of the bucket to push it in the desired direction. While so engaged all the members of the crew who were called upon to assist in this manner were severely shocked and Stansbury was killed.

The defendant, a public utility corporation, has, in the vicinity of the accident, high-tension wires strung on poles, and its liability is pitched upon the alleged negligent construction of these wires in that they were strung over the highway without due regard for the safety of those whose employment required that they be in close proximity. It is alleged that the wires were not insulated; that no notices or warnings of danger were posted and that "jumpers" were not properly installed, in that they were placed under instead of over the wires; that the wires were not covered with insulation and that defendant in general was guilty of gross negligence and carelessness in connection with the erection of its poles and wires, with the result that "the current on said wires, then and there under the exclusive control of defendant corporation, in a

manner unknown to petitioner, escaped therefrom, untimately (ultimately) and in some unknown manner reaching the clam shell bucket, being the sole and proximate cause of the death of petitioner's husband."

There is no doubt that Stansbury's death was due to the fact that the clam shell bucket was in some manner charged with electricity, since he received the shock as soon as he placed his hands on the bucket, but how the bucket received the charge is very uncertain.

Plaintiffs offer, as a possible solution, the suggestion that the electric current entered the earth by means of a "guy wire" (the wire leading from the pole into the earth) attached to a "dead man" (a post, 6 or 8 feet long buried from 2 to 3 feet in the ground), and that contact between the bucket and the earth caused the bucket to be charged with electricity. The guy wire, it is said, should have been insulated, which was not done in this case.

On the other hand, defendant explains the accident by saying that when the crane was moved the arm made contact with the high-tension wire, thus communicating the electrical energy to the bucket. However, all of the witnesses declare that the bucket, at no time, was any nearer to the wire than 12 inches, and the uncontradicted evidence of experts is that electricity of the voltage which this wire carried would not "jump" a span in excess of one-fifth of an inch.

The record establishes the fact that the best modern practice does not require insulation of high-tension wires suspended as this one was, about 30 feet from the ground, nor is there any appropriate legislation requiring insulation. It does not appear that any custom or law required the posting of notices of the dangerous nature of the overhead wires and, moreover, the several members of the crew operating the crane were familiar with the danger involved. Consequently, notices and warning signs would have made no difference. It also appears that the power lines of defendant in the vicinity of the accident were constructed in accordance with the requirements of the United States Bureau of Standards. There is, therefore, no proof of any negligence on the part of the defendant, but counsel for plaintiff says that, in the ordinary course of events and when proper care has been exercised in the erection and equipment of wires and poles conveying electrical energy, no danger to the public results and that, having shown that Stansbury was electrocuted under circumstances indicating that the electricity which caused his death came from one of the wires of defendant company, a presumption of negligence arises under the doctrine of "res ipsa loquitur."

"Where the thing which caused the injury complained of is shown to be under the management of defendant or his servants and the accident is such as in the ordinary course of things does not happen if those who have its management or control use proper care, it affords reasonable evidence, in the absence of explanation by defendant, that the accident arose from want of care. This statement of the rule of res ipsa loquitur based on the expression in an early English case, which has been widely quoted with approval, has been in substance most frequently adopted and applied in subsequent decisions so that the occurrence of an injury under the circumstances therein set forth raises a presumption or permits an inference that the party charged was guilty of negligence." C. J. vol. 45, verbo "Negligence," p. 1193.

We do not believe this doctrine applicable here. It is commonly relied on in negligence cases to supply, by presumption or inference, the lack of direct proof. Where the known facts surrounding an accident create a reasonable probability that its occurrence was due to negligence, the law infers, without actual proof, that there was negligence because of the common experience that like effects are due to like causes. If, for example, a roof collapses and injures some one and there is no explanation of the accident, it will be presumed that the roof fell on account of being improperly supported, because, otherwise, roofs do not, ordinarily, fall. However, the doctrine is not to be extended beyond proper limits and will not serve as a substitute for proof. It has no place in the presence of direct evidence, nor can it apply unless, from the proven facts, a reasonable inference of negligence may be drawn. The defendant is considered to have superior knowledge of the cause of the injury and is called upon to explain when it appears that the accident was due to the faulty character of some instrumentality in his possession, or under his control. The rule is different where there is no contractual relation:

"Excepting where contractual relations exist between the parties, as in the case of carriers of passengers and some others, negligence will not be presumed from the mere happening of the accident and a consequent injury, but the plaintiff must show either actual negligence or conditions which are so obviously dangerous as to admit of no inference other than that of negligence. Stearns v. Ontario Spinning Co., 184 Pa. 519 [39 A. 292, 39 L. R. A. 842, 63 Am. St. Rep. 807]." Corpus Juris, vol. 45, p. 1210 (footnote).

In the case at bar the most reasonable explanation of the accident does not invoke the liability of defendant. In moving the crane the arm must have come in contact with the feed wire of defendant. We are aware that all witnesses who have testified on this point are agreed that no actual contact occurred, and we are convinced of their sincerity, but believe them to be mistaken. It is most probable that, in attempting to pull the bucket to the desired point on the roadway, the crane touched the wire. It was only necessary that contact be established for an instant in order that the deadly fluid might be communicated to Stansbury's body. Indeed, it is likely that, in swaying about, the arm of the crane only touched and immediately parted with the wire so as to deceive the crew, who testified that it was at all times 12 inches or more away from the wire. Moreover, Mr. Ricker, an electrical engineer, holding the degrees of Bachelor and Master of Science of the Massachusetts Institute of Technology, testified that in his opinion the accident could not possibly have happened except through contact between the crane arm and the wire. Mr. Ricker's testimony in this respect is not contradicted by any other expert, nor is there any attempt to explain the accident upon any other reasonable theory. The crew of the crane were admittedly familiar with the danger of contact with the highly charged wire and, consequently, are alone to blame for the unfortunate accident, which was due entirely to their negligence.

For the reasons assigned the judgment appealed from is affirmed.