## BUJOL et ux. v. GULF STATES UTILITIES CO. (COUCH & PORTER CONST. CO., Intervener).
### No. 1116.

Court of Appeal of Louisiana. First Circuit.
April 17, 1933.

546

Thos. Arthur Edwards and C. V. Pattison, both of Lake Charles, for appellants.

Pujo, Bell & Hardin, of Lake Charles, for appellee.

LE BLANC, Judge.

Linden Bujol, eighteen years of age, son of Mr. and Mrs. Adam Bujol, was killed by electrocution by a high-tension wire of the defendant company, Gulf States Utilities Company, in the town of Jennings, La., at about 6:30 o'clock in the evening of June 5, 1931.

He was an employee of the Couch & Porter Construction Company, which was engaged in building a paved highway in Jefferson Davis parish; his particular duty on the day on which he was killed being to connect a water pipe line along the proposed highway to furnish water with which to mix the concrete. His parents were awarded compensation for his death under the Employers' Liability Statute (Act No. 20 of 1914, as amended), and the employer has intervened in this proceeding claiming the right to recover payments it has made, and is obligated to make, against the defendant.

Plaintiffs allege in their petition that their son was killed through the gross carelessness and negligence of the defendant company, specifying numerous acts thereof, the most important of which only it is necessary here to note as follows: (1) That it failed to properly protect and guard its high-powered wires by insulation; (2) that it gave no signs of warning by posting or otherwise of the potential danger lying in its lines; (3) that it unnecessarily overcharged its wires and permitted them to sag, and especially at the place where this accident occurred they sagged to such a point as to have made it extremely dangerous to workmen, travelers, and pedestrians who had to be in that vicinity.

Alleging that their son was the only member of their family to whom they could look for support in their declining years, and that because they will be deprived thereof as well as of his love, affection, and companionship, plaintiffs each ask to be awarded damages against the defendant in the sum of $25,000.

The defendant, for answer to plaintiffs' petition, denies all the acts of carelessness and negligence charged against it, and avers that its power line was constructed, maintained, and operated in the usual prescribed and proper manner, and that the accident and subsequent death of their son was caused through his own carelessness and negligence "in attempting to perform the work for which he was employed in a manner known to him to be unsafe and dangerous and, contrary to the positive instructions of his employer." As an alternative, defendant specially pleads contributory negligence. The petition of the construction company was also answered by the defendant and the intervention thus put at issue.

From a judgment in the district court rejecting the demands of the plaintiffs and of the intervener, they have all taken this appeal.

The place where this accident occurred is within the corporate limits of the town of Jennings, but, from the fact as it appears in the record that defendant's power line ran through an abandoned rice field inclosed within a barbed wire fence, it can readily be assumed that it was an uninhabited part of the city.

Plaintiffs' son had only been working with the construction company a few days before he was killed. He was in a crew of three men engaged in connecting pipes with which to lay down a water line as heretofore stated. The pipes they were using were old and rusty, and, before being connected, had to be cleared of the accumulated rust on the inside. To do this, it was necessary to hammer them on the outside so as to loosen the rust and then to stand them on end, so that they could be cleared of the particles. Of the crew of three, young Bujol was the only educated man, and, whilst it cannot be said from the testimony as we read it that he was the foreman, still he seemed to have more to do and say on the job than the two others who were illiterate.

Just before the accident they had been hammering a length of pipe measuring 22 feet 2½ inches long; and were standing it on end to clear it of the rust. At this moment they were inside the barbed wire fence which inclosed the rice field, standing either on top or on the side of a small dam or levee formerly used to hold the water in the rice field. This levee was almost directly under the power lines of the defendant company, and, as they raised the pipe, the top end of it either came in direct contact with or so near a high voltage line as to attract the current from it, and the result was that the two other men who were holding the standing pipe with Bujol were severely shocked, and he was killed almost instantly.

■ Taking up the charges of negligence in the order in which we have stated them, we might say right here that we do not believe that there is any testimony to support either of the first two.

It is not disputed that the wires of the defendant company at this point in its line were not insulated, but the evidence shows that a line of this kind is not generally insulated,

and that the National Bureau of Standards whose rulings govern in their construction does not require that they be. The duty of insulation seems to be limited, according to the authorities as we read them, "to those points or places where there is reason to apprehend that persons may come in contact with the wires, and the law does not compel electric companies to insulate their wires everywhere, but only at places where people may go for work, business or pleasure, that is, where they may reasonably be expected to go." Ruling Case Law, vol. 9, p. 1213, par. 31. From 20 Corpus Juris, p. 355, par. 42, we quote the following:

"The exercise of a sufficient degree of care requires a careful and proper insulation of all wires and appliances in places where there is likelihood or reasonable probability of human contact therewith. * * *

"The duty to insulate does not extend to the entire system or to parts of the line where no one could reasonably be expected to come in contact with it."

Here it is shown that the wire which carried the charge of electricity that killed young Bujol was 20 feet 2½ inches above the top of the rice levee, which itself is shown to have been as much as 2 feet high. Moreover, as also shown, it ran through an old rice field, where we hardly believe it could be contended that there was reasonable likelihood or probability of people coming in contact with the wires. The nature of the work Bujol was engaged in and the circumstances under which he came in contact with the wire in this case furnishes, in our opinion, an exceptional case, which certainly was not in the contemplation of the rule announced in the authorities cited.

It is not disputed either that defendant posted no signs or warnings of danger in the vicinity where this accident occurred, but we think that what has been said with reference to the lack of insulation of the wires applies with equal, if not greater, force, in regard to the placing of warning signs. We have not been referred to any law or custom which requires the posting of such signs in places like this, where it is not reasonable to expect people to come in contact with the heavily loaded wires.

■ This brings us to a consideration of the third and most serious charge of negligence against this defendant. This charge involves the sagging of the line and its being overcharged with electricity. Counsel for the plaintiffs stresses very strongly the point that the pipe which Bujol was handling did not come in actual contact with the wire, but that the electric current flowing through the wire was of such force that it reached out and ran into the pipe, thus bringing on the shock which killed him. The allegation made in the petition is that "the current leaped out several feet" and threw its full force into the pipe that the deceased was handling, causing his horrible death. The purport of this allegation of course is to impress upon the court the excessiveness of the load of electric current in the wire, as it is further alleged that it "was overcharged beyond the necessary needs and uses for its purpose."

To support their charge of negligence that the wire was overloaded as they alleged, plaintiffs rely on the testimony of a young man named Chiasson, who says that at the time of the accident he was about 400 feet from the spot at which Bujol was killed, that he was attracted by the flash emitted from the wire, and estimates the distance between the pipe and wire at from 6 to 18 inches. He seems to be positive that they never came into actual contact with each other. This witness, on cross-examination, says that from the place and position in which he was standing the pipe was between him and the wire, and whilst he is made to say further on that there was nothing to obscure his view, and insists that the pipe and the wire did not touch, it would seem impossible, considering his position and the distance at which he was, which really is shown to be more than the 400 feet estimated by him, that he could tell with such positiveness that there was no actual contact, much less measure the length of the flash or spark that was thrown from the wire.

The testimony shows that the wire used by defendant is what is known as No. 4 (meaning its size), and is sufficient to carry the current of 33,000 volts, which was being transmitted through it. Defendant also produced an expert witness, Professor C. W. Ricker, who holds a degree as master of science from the Massachusetts Institute of Technology and a degree of master of electrical engineering from Harvard University, not to mention other admitted qualifications, who testifies positively that a spark could not possibly jump more than 2 inches from a 33,000 volt line to another conductor, "Under the worst possible condition," he says, "it would be less than two inches." By "the worst possible conditions" we understand him to mean conditions favorable to the easy conduct of electric current, and no such conditions are shown to have existed on the evening of this accident. After an actual contact between the wire and a conductor, however, as we understand his testimony further, and on their separation, there is a spark created; "an arc drawn out," as he states, "anywhere from six inches to three to five feet long." That most probably is what occurred in this case and was the flash observed by the witness Chiasson.

A comparison between the length of the pipe which was 22 feet, 2½ inches long, and the clearance between the top of the levee on which Bujol and the other employees were handling it, and the sagging wire directly over the very spot at which they were, which

is shown to have been 20 feet 2½ inches, shows that it would have been possible for the pipe to have come in actual contact with the wire as, had it been standing perpendicularly, it would have extended 2 feet and 6 inches above it.

The testimony shows that at the spot where the accident took place, about midway between two poles 300 feet apart, the wire sagged about 3 feet 6 inches. This, it appears, is not more than the usual sag that occurs in a line constructed as was this one according to the requirements of the Bureau of National Standards.

Our consideration of the facts as they appear in the record leaves us with grave doubt as to whether plaintiffs have shown any negligence whatever on the part of the defendant. Viewing the case from the standpoint most unfavorable to the defendant, however, we do not see how, under the testimony, plaintiffs can hope* to overcome the plea of contributory negligence on which the lower court rejected their demands.

W. H. Glaskow, assistant superintendent of the Porter Construction Company, young Bujol's employer, and who had charge of the laying down the water pipe line on which his crew was working, testifies that he told him to be careful of the wires above. He had observed, he says, that in raising the first two or three pipes he was getting close to the wires, and he told him to take them in the street to knock the rust out of them, and then throw them back again to connect the joints. Later during the day, he says that his attention was called by Mr. Norman, an officer of the construction company, to the fact that the pipes were being raised on the sidewalk, apparently too near the wires, and that he again tried to impress upon the deceased, this time a little harder, that the wire was dangerous, telling him rather emphatically that the wires would "kill the hell out of him" if he did not stay far away enough from it. C. M. Goodwin, foreman for the construction company, also swears that he cautioned him about the danger of the wires, and heard Glaskow warn him and instruct him to go out to the middle of the road before standing the pipes up.

Willie Goudeau, who worked in the same crew with Bujol, testifies that he knew of the danger in working too near the wires, and told him that they had better be careful. John Guedry, negro helper, also in the same crew, says that he knew enough about electricity to realize that the power lines were dangerous if anything came in contact with them, and he admits that a statement given by him some time after the accident to the effect that he heard Goudeau tell Bujol to be careful is correct. These last two were witnesses for the plaintiffs.

Such testimony is convincing that the deceased had ample warning, if not positive instructions, on the subject. The fact is that he hardly needed any, as from the testimony it appears that he was an intelligent young man ready to enter the eleventh grade in high school at Donaldsonville, and had had working experience in an oil refinery at Goodhope, a few miles out of New Orleans. Because of his education, it is reasonable to presume that he was better able to appreciate the danger involved around these high voltage lines than were, in this respect, his less fortunate fellow workmen.

Under the facts as they appear, the deceased can be said to have voluntarily exposed himself to a danger of which he had been apprised, and in fact which he personally must have realized, and he must be held to have contributed to the accident which caused his unfortunate death. We think that the following cases cited by the district judge support his finding on this point: Borell v. Cumberland Telegraph & Telephone Co., 133 La. 630, 63 So. 247, L. R. A. 1916D, 1064; Bouchon v. New Orleans Railway & Light Co., 154 La. 397, 97 So. 587; Boudreaux v. Louisiana Power & Light Co., 16 La. App. 664, 135 So. 90. Counsel for plaintiffs cites with confidence the case of Card v. Wenatchee Valley Gas & Electric Co., from the state of Washington, reported in 77 Wash. 564, 137 P. 1047, 1048, in which it appears that the high voltage wire hung 3 feet 6 inches nearer the ground than did the wires in this case, and there was no evidence that the deceased "knew of the extreme high power of the current, nor of its deadly effect to one coming in contact with it." In this case, young Bujol not only knew of the danger, as he had been told by Goudeau to be careful, but he had been positively warned and cautioned about it by his employers. We have carefully considered the other authorities cited by counsel, but find that, considered in connection with the facts here involved, they have no application.

■ Counsel for plaintiffs also invokes the doctrine of res ipsa loquitur, but we are of the opinion that the rule laid down in the case of Boudreaux v. Louisiana Power & Light Co., supra, to the effect that the doctrine has no place in the presence of direct evidence, applies with equal force in this case. As stated by the learned trial judge, "the doctrine allows a presumption of negligence, on the part of a defendant, as arising under certain circumstances, but has no application where it is clearly shown that the deceased was killed by his own negligence."

We conclude that the judgment appealed from properly sustained the plea of contributory negligence and rejected the demands of the plaintiffs as well as of the intervener, and it is therefore affirmed.