### HOLDEN v
### CINCINNATI GAS & ELECTRIC CO

Ohio Appeals, 1st Dist, Hamilton Co

Decided Nov 29, 1937

Kunkle & Kunkle, Cincinnati and Murphy & Murphy, Cincinnati, for appellee.

C. S. Weakley, Cincinnati, and William B. Ramsey, Cincinnati, for appellant.

## OPINION

By MATTHEWS, J.

This is an appeal on questions of law from a judgment of the Common Pleas Court of Hamilton County in favor of the plaintiff in an action to recover damages on account of personal injuries caused by a current of electricity passing through his body under the circumstances hereinafter detailed.

The defendant claims that the judgment is excessive and that there is no substantial evidence of negligence on its part directly causing the injury, and that the evidence clearly shows that the plaintiff's injuries were caused by his sole negligence.

We dismiss the contention that the judgment is excessive with the statement that in our opinion the evidence of the plaintiff's injuries and the resultant damage is sufficient to sustain the judgment. We shall therefore confine ourselves to a consideration of whether under the evidence and the law the plaintiff established a liability against the defendant for the damage sustained by him.

The defendant was a public utility corporation engaged in furnishing electrical current to the village of Terrace Park, which it distributed under a franchise from said village, by means of wires strung on poles erected in the public streets between the sidewalk and the vehicular portion, one of which streets was Floral Avenue. Some of these wires were high tension wires carrying high voltage, and others were service wires, but it is only the former with which we are concerned in this case. There were two high tension wires and these were parallel with one another and about twenty

feet above the street level. These wires had been insulated, but the insulation had worn off in certain places where the wires had rubbed against the limbs of trees that stood along the side of the street.

. The plaintiff was employed at the time by the Works Progress Administration. He was about twenty-six years old and had worked as a manual laborer for many years, but had never been engaged in work that familiarized him with electricity, and, therefore, his knowledge of its dangerous character was no more than that possessed by the average person under such circumstances. As an employee of the Works Progress Administration he had been engaged in trimming trees in Terrace Park for between two and three months prior to May 20, 1936. To trim the upper branches he was furnished with pruning shears, an instrument consisting of a wooden handle eight or ten feet long, at one end of which are shears that are operated by a rope or wire cable. When the branches could not be reached from the ground, he would climb up the tree and stand on one of the branches while operating the shears. He had been trimming trees on Floral Avenue for at least one day prior to May 20th, and had been so engaged for about two hours on that day trimming the tree in which he was at the time he received his injuries. Supposing that he had finished trimming the tree he descended to the ground. After he was on the ground his attention was called to a dead limb that he had missed and was told to get up into the tree to cut it off. Thereupon, he climbed to the top of a ladder that was ten or twelve feet long, stepped onto a limb of the tree about three feet above the end of the ladder, used the pruning shears to cut the limb and was preparing to descend when he received the electric shock. He described the circumstances as follows:

"A. I got up in the tree and I jerked that limb off. I looked around to see if I was safe from the wires; about four feet I was in the clear and I started to lower the pruning pole to the ground and that is as much as I can remember.

Q. Then what happened? Did you feel any sensation any place?

A. I felt a tingling sensation through my fingers for just an instant and then I was out.

Q. Then you were out? A. Yes sir. ·

Q. Then what is the next thing that you remember?

A. Then the next thing I remember is they were putting me in a car and they took me to the doctor."

As to his knowledge of the wires, he said:

"Q. Had you observed wires through those trees in Terrace Park?

A. We could see the wires through some of them, yes.

Q. Those were electric wires? A. Yes sir.
 * * *
Q. Did ·you observe the wires in this tree?

A. I seen a couple of wires through there.

Q. Where were those wires located?

A. Above my head.

Q. How far were those wires above your head?

A. As near as I can recall, right at the time when I noticed them, they were about six or eight feet.

Q. Those were electric wires?

A. I would suggest they were.

Q. You say you suggest they were; you mean you knew—you thought they were?

A. Yes sir.

Q. When you saw those wires you realized they were electric wires?

A. I figured that is about · what they were.
 * * *
Q. In this tree you were working on, you knew those wires were in the tree?

A. Yes.

Q. Were there any other wires below those top wires that you saw which was six feet above you?

A. I couldn't say; I never seen any.
 * * *
Q. Just tell us where you were; you had seen those wires before while working in the tree.

A. I noticed those wires, a couple of them wires at the time I was just about ready to get down.

Q. You said a few minutes ago that from where you were standing it was uncomfortable to see the wires.

A. It was.

Q. What do you mean by uncomfortable to see the wires?

A. The tree was full of foliage, the wires running through the limbs.

Q. What do you mean by uncomfortable? You mean it was difficult to see the wires?

A. Yes sir.

Q. But you had seen the wires and knew the wires were there.

A. I knew there were a couple of wires there."

And as to his conduct at the time of the accident he said:

"Q. ⁎ ⁎ ⁎ ⸱ v ll ask you whether or not you did watch out for the wires?

A. I did.

Q. And before you were getting down that day, did you?

A. Absolutely I did.

Q. What was your understanding relative to the insulation?

A. As far as I could see, there was no danger.

Q. Were the wires insulated? A. They were.

Q. As far as you could see?

A. As far as I could see."

It is suggested that there was no prior break at the point of contact with the pruning shears, and that the evidence is equally compatible to the suggestion that the plaintiff at that time in some way, either accidentally or intentionally operated the shears and cut the insulation, thereby causing the metal to come into contact with the electric wire. But the fact that the insulation was off for a distance of eight inches is not compatible with just an incision made by the shears at the time. The evidence showed that these wires had been there for seven years and that within a few inches of the place where the shears touched the bare wire, were other bare places almost as large, tending to prove that other causes had operated to remove the insulation.

Briefly then, the plaintiff knew of the presence of the wires, but not their exact location at all points, that they were charged with electricity, that they were insulated, but knew that there was the possibility of the electricity escaping through a break in the insulation, and, therefore, tried to avoid touching them, yet through inadvertence the pruning shears which he was lowering to the ground came in contact with one of the wires at a point where there was no insulation, and, as a result the electric current was transmitted through the shears and down the handle to his hand and into his body. That his position at the time was insecure, and his attention divided among several objects, so that he might descend in safety is reasonable to suppose. The evidence also is that the limb and foliage prevented a clear view from his position in the tree. This presents the question of whether under such

circumstances the plaintiff can recover, even should it be found that the defendant was negligent. In other words, does this situation show that the plaintiff, as a matter of law, was negligent? For if he was not negligent as a matter of law, and there are under such circumstances conflicting inferences which reasonable men could draw, then the issue of contributory· negligence was properly submitted to the jury, and we must then consider the record to determine whether it contains substantial evidence of the defendant's negligence.

Now does the fact that the plaintiff permitted the pruning shears to come in contact with this wire conclusively show negligence?

Many cases have arisen under somewhat similar circumstances. We shall briefly consider those relied upon by the appellant

Miller v Suburban Power Co., 41 Oh Ap 70, (11 Abs 551) and Jesson v Mansfield Ry. L. & P. Co., 30 O.C.A. 170, are cases in which the injured person was a trespasser at the time and in our view are inapplicable for that reason. In Clarke v City & Suburban Telephone Assn. et, 16 Ohio Dec., 431, and Cincinnati Gas & Electric Co., 80 Oh St 27, the injured person was a skilled mechanic entirely familiar with all the surrounding circumstances and of the hazards incident· to the presence of electric wires. Such cases fall into a different category than the one at bar.

As we view it, this case is in the same class as that of Interstate Power Co. v Thomas, (51 Fed. [2d] 914), 84 A.L.R. 681. In that case a farmer was assisting in moving along a public highway a threshing machine, pulled by a tractor. When they reached a certain point he looked back from his seat on the tractor and saw that the elevator would not go under an electric wire over the highway. He stopped and went back to the separator, where he saw the wire was actually touching the elevator. As he would have been obliged to back up grade to remove the contact in that way, he decided, after studying his dilemma, to try to get the wire loose from the elevator without backing. The evidence showed that he was conscious of the danger and tried to avoid it, but when he got on the wheel of the separator and took hold of an iron rod he received an electric shock. It was claimed that he was guilty of negligence as a matter of law. On this subject, the court, at pages 689 and 690 said:

"Could not a reasonable man under all the circumstances take into consideration

in determining what to do, the fact that the wire looked the same as the one to his house which carried only 110 volts and was insulated and not dangerous? No rule could be laid down as to what an ordinary prudent person would do in the situation presented to plaintiff. Subsequent developments show he did the unwise thing. The trial court in passing on the motion for new trial discussed the situation as follows: 'My own impression is that what Mr. Thomas did was an imprudent thing; that he took unwarranted chances; that he selected a way of extricating himself from a difficulty which involved unnecessary risk; but I did not think that what he did was so conclusively negligent as to justify me in withholding the case from the jury. Had Mr. Thomas been dealing with a situation involving dangers and hazards with which all of us are familiar and had he selected an obviously hazardous way out of his trouble, when there was a safe way, there would have been no doubt as to his carelessness.'

"When a court assumes to say that reasonable men in exercising their fair and impartial judgment could not differ on a question of fact such as is here presented, it should be very sure of its ground. A layman's opinion on a question of fact may be fully as reasonable as a court's opinion. Where reasonable men may fairly differ in their conclusions from the evidence as to a question of fact, the solution thereof is for the jury."

In the case at bar the plaintiff was lawfully near these wires, engaged in work that prevented concentration of his entire attention on avoiding them. He knew they were insulated, and that touching them at most places would not be attended by harmful consequences. He had no special knowledge of the deadly character of high voltage electricity, or that these wires carried high voltage. However, he was trying to avoid touching them and did so only because he was unable to see them clearly from his position in the tree, combined with the difficulty of lowering the pruning shears from the tree, while in an awkward position in the tree. Our view is, that, under such circumstances, the issue of contributory negligence is one of fact for the decision of a jury.

The last question is, whether there is any substantial evidence of negligence on the part of the defendant. Appellant's counsel point out that there was no stat-ute requiring these wires to be insulated. That is conceded, but that does not conclude the inquiry. There is a rule of universal application that wherever a person or corporation through his or its activities is brought into proximity with another, some care is required so that harm will not result to such person. The duty of care exists in the absence of any statute, and, if care is omitted and injury directly results therefrom, liability arises.

In this case the defendant was conscious of the danger of electricity escaping from these wires and for that reason had them insulated originally, but failed to see that the insulation was maintained. While these wires were about twenty feet above the street, they were directly over a row of trees and among the branches of some of them. A reasonable person would anticipate that these trees would be trimmed in course of time, and that to do so workmen would be required to climb thereon and get near these wires, and at the time have shears or saws with them.

That there is a duty dependent upon circumstances, to insulate the wires and keep them insulated is supported by the authorities. In 9 R.C.L. at page 1213 and 1214, it is said:

"It is only reasonable that the duty of providing insulation should be limited to those points or places where there is reason to apprehend that persons may come in contact with the wires, and the law does not compel electric companies to insulate their wires everywhere, but only at places where people may go for work, business, or pleasure, that is, where they may reasonably be expected to go. In accordance with this reasoning it would seem that it is not evidence of negligence to suspend uninsulated wires over an awning, which serves merely as a shade and protection for the front of a building and is not used as a place of resort either for pleasure or for business. It has been held however that one who goes upon a roof over which electric wires are stretched cannot be regarded as going into the presence of known danger and assuming the hazards thereof, and as forfeiting his right to recover for injuries suffered from the negligence of the company maintaining such wires in not keeping them properly insulated. It is a matter of common knowledge that persons frequently resort to such a

place, and it may be reasonably anticipated that persons will go there. So, also, it has been held that an electric company which maintains upon a public bridge wires carrying a dangerous current, without sufficient insulation, and so placed that persons required to work upon the bridge may come in contact with them, is liable for injury to a workman by a disruptive discharge of electricity from the wires, without negligence on his part."

We find no Ohio case in conflict with this statement of the law.

We are of the opinion that whether the circumstances imposed a duty upon the defendant in favor of the plaintiff and whether that duty had been performed, were issues of fact properly submitted to the jury.

For these reasons, the judgment of the Common Pleas Court of Hamilton County is affirmed.

ROSS, PJ, and HAMILTON, J, concur.