## HIGGINBOTHAM v. LOUISIANA POWER & LIGHT CO.

### No. 17350.

Court of Appeal of Louisiana. Orleans.

Nov. 4, 1940.

Rehearing Granted Jan. 27, 1941.

John D. Nix, Jr., and Walter B. Hamlin, both of New Orleans, for appellant.

Monroe & Lemann and J. Raburn Monroe, all of New Orleans, and John E. Fleury, of Gretna, for appellee.

WESTERFIELD, Judge.

George Ernest Higginbotham was killed on September 2, 1937, while in the employ of the Public Belt Railroad Commission of New Orleans. His employer maintains and operates a bridge across the Mississippi River a few miles above the City of New Orleans. It was while Higginbotham was employed as maintenance man on the bridge that he was electrocuted. He was inspecting the piers which support the bridge for the purpose of ascertaining whether there had been any deflection from the perpendicular, using for that purpose a "plumb-bob", composed of piano wire with a weight at the end of it. Higginbotham was on a "catwalk", which is under the upper surface of the bridge, from which position he lowered the plumb-bob to the surface of the ground beneath the bridge, where it was permitted to rest in a bucket of oil in order to prevent swaying and an attendant on the ground measured the distance from the base of the pier. The wire was attached to Higginbotham's waist by a spool which he wound up as occasion required. Beneath the bridge, on the west bank of the Mississippi River, the defendant, Louisiana Power & Light Company, maintained a high tension service wire (13,200 volts) without insulation, which transferred electric energy to its customers. The catwalk was about eight-two feet above the riverbank and the live wire was about thirty-five feet above the bank, so that the wire was approximately forty-seven feet below the point where Higginbotham was standing. After plumbing the particular pier known as "Bent No. 70", decedent wound up the spool of wire so that the weight at the end of it was about eight feet below defendant's wire. With the plumb-bob in this position, Hig-ginbotham walked along from Bent No. 70 towards Bent No. 71, when the piano wire came in contact with defendant's high tension wire, which transmitted the electric current to his body, killing him instantly.

Decedent's widow, Hazel Young Higginbotham, first brought suit against his employer, the Public Belt Railroad Commission, for workmen's compensation. That suit was considered by us and decided adversely to the plaintiff upon the ground that Higginbotham was engaged in interstate commerce, and that plaintiff's remedy, if any, was under the Federal Employers' Liability Statute, 45 U.S.C.A. § 51 et seq., and not the Louisiana Workmen's Compensation Law, Act No. 20 of 1914. See Higginbotham v. Public Belt Railroad Commission, La.App., 181 So. 65. This decision was subsequently affirmed by the Supreme Court. 192 La. 525, 538, 188 So. 395. Reference is made to these two opinions for a more detailed statement of the facts.

In the instant case, which is one sounding in damages, ex delicto, based upon Article 2315 of the Revised Civil Code, the gravamen of plaintiff's contention is that the defendant was negligent: Primarily, because it failed to insulate its high tension wire, and also because it did not post warning signs concerning the presence of the dangerous wire and finally, due to the location of the wire.

The defendant company admitted that its wire was not insulated, but denied that it was in any way negligent. The accident, it was claimed, was entirely due to the negligence of the decedent in carelessly allowing the piano wire, which was attached to his body, to swing into the high tension wire.

The district court found in favor of the defendant, and the plaintiff has appealed.

We have carefully considered the evidence in the voluminous transcript and are of opinion that we cannot improve upon the review of the evidence given by the learned judge of the trial court, from which we quote the following:

"On September 2, 1937, Higginbotham, the deceased, was employed by the New Orleans Public Belt, as a maintenance man * * *, at a salary of One Hundred Seventy-Two and 50/100 ($172.50) Dollars, per month. He was thirty-three (33) years of age at the time of the accident which resulted in his death, and on the morning in question, he, together with

two fellow-workmen, Aiken and Hof, were engaged in inspecting the expansion movement of the bridge, otherwise described in the testimony as plumbing the bridge.

"They had started the previous day, and the procedure to plumb the bridge was along this line: Higginbotham was on the top of the bridge with a life belt, a reel, and a #7 piano wire; Aiken and Hof were on the ground below him. Aiken would make a record of the top and bottom measurements, and Hof was engaged in steadying the wire when it was lowered by Higginbotham, by placing a weight on the end and emersing it in a bucket of lubricating oil, until it stopped swaying and was absolutely still.

"The three men were checking to see that none of the expansion joints were in possible danger of locking, and they were also checking the tower or columns which separate the bridge, to determine whether they were exactly plumb or not. Sometimes, the pedestals at the bottom might settle and throw the tower out of vertical. Higginbotham, who was on top of the bridge, would unreel the #7 piano wire and lower it to the ground, where it was taken in hand by Hof, who would attach an eight or ten pound weight to the end of it and place it in a bucket of lubricating oil to keep the wire from swinging, so that it would remain still, and the distance would be measured from the column at the top and the column at the bottom. If the wire was 4″ away from the column at the top, it should be the same distance from the column at the bottom, which would indicate that it was plumb. There might be some slight deviation in the case of some of the towers, but wherever the measurement at the top and the measurement at the bottom would correspond, this would indicate that the tower was absolutely plumb.

"When Higginbotham would take the measurement at the top, he called it off to Aiken on the ground below, who would make a record of it; then Hof would call off the measurement on the ground to Aiken, who would likewise make a record of that measurement.

"Prior to the date of the accident, the men had started near the river and had plumbed these columns, going towards the woods. They had reached a point between Bent #70 and Bent #71 going west. A bent is composed of two columns and four columns form a tower.

"For several months prior to the date of this accident, Higginbotham and Hof had measured the expansion, but this was the first occasion that the columns were plumbed.

"When they reached the point where the accident happened, Higginbotham dropped the piano wire to the ground where Hof got a hold of it and put the weight attached to it in the bucket of oil. This was on Bent #70. After plumbing this bent, Higginbotham reeled the piano wire up about 15′ and climbed upon the flange of the girder, which raised it 15′ more. They then started to plumb Bent #71, and Higginbotham proceeded to walk towards this bent, after pulling the piano wire up some distance, and when Hof looked up and saw that Higginbotham was going to hit the high tension electric wires with the piano wire, he hollered to him: 'Hig, you are going to get tangled up', and at the same time he saw 'like a .22 bullet went off and a flash of lightning went up to him, and he made a tumbleset, and I stepped out of his way. I was standing right under where he hit, and I walked about 6′ off and he hit the ground.'

"Higginbotham was killed instantly, and the testimony in the record is that the wire was burned off a distance of about eight (8′) feet from the bottom, which would indicate that Higginbotham had pulled the wire up, but had not pulled it up sufficiently high enough to clear the high tension wire, which had to be passed before he got to Bent #71.

"Aiken, one of the men, had his back turned and did not see the accident, and the only time he knew something had happened, was when Hof called and he saw Higginbotham's body, about five or ten seconds after it had hit the ground.

"Aiken testified that he had passed this particular spot every day; sometimes he walked the deck, sometimes he used a motor car, and sometimes he passed on the ground in a company truck. Sometimes he was by himself and sometimes with Higginbotham and Hof. In passing this spot, he saw the pole and line of wires, they having been there since the bridge was put in service. He knew that the wires on the poles were electric wires, but did not know that the wires were not insulated or high tension wires. He thought they were a little insulated light circuit, and both Higginbotham and Hof saw these wires also.

"Hof testified that he did not know that there was a high tension wire anywhere around there, and was never informed of this fact. He testified that he and Higginbotham had plumbed the bridge with a piano wire, on both sides of the river, three or four times, and then later stated that this was the first time. He had occasion frequently, in four years, to ride across the bridge in a motor car, to walk back and forth on the bridge from one side of the river to the other, and also walked alongside of the bridge on the ground with Higginbotham.

"He knew for a year or so that there was a line of poles and wires running across the circle under the bridge where the accident happened, but he did not know what these wires were, and never took the trouble to find out, and he does not know the difference between a telephone wire and an electric wire—nobody ever notified him, although he had seen them there before.

"Plaintiff placed on the stand several witnesses, one of whom, Burgess, testified that he was an electrical engineer; did a few jobs, particularly the Fish Hatchery at Bayou Lacombe in St. Tammany Parish. He proceeded to testify in connection with the Code of the National Board of Underwriters, to the effect that it would not be feasible to pass the wires under the bridge, without being insulated, under the provisions of the Code, but he did say that the Code did not exactly call for the word 'insulated', but that the wires must be located so as to be made free of any hazard, that is, either put them underground, or move them around the end of the bridge, or get them out of the way.

"When asked what specific action of the Code of the Underwriters was violated, the witness became evasive and finally admitted that he did not know what particular section was violated.

"The following day he returned to the stand and pointed out Par. 'C', Section 7322 which comes under the heading: 'Overhead Wiring in Public Roads, Streets and Alleys' and this particular paragraph which refers to clearance from buildings, reads as follows:

" 'Open conductors of voltages between 7500 and 15000 volts between conductors shall be kept at least 8 feet horizontally, and open conductors of more than 15000 volts between conductors shall be kept at least 10 feet horizontally, from all build-ings except those which they serve or central stations, substations, and transformer vaults.'

"He stated that the wires which pass under the bridge do not serve any substation or any central station or transformer vaults, and that the clearance from the top of the wire is not over five (5') feet; and he was finally asked to take the Code and check it to see if he could pick out anything in the Code which refers to the construction of overhead wires, under or over bridges, and he answered that he could not.

"Schwartz, another witness for the plaintiff, an electrician for the Public Belt, estimated that the closest proximity of the closest wire to the bridge tower was from four to four and one-half feet, at the most, and he considered these wires a hazard, subject to killing somebody, unless there is a scaffold in that vicinity. He was cross-questioned concerning whether any of the men on the bridge ever worked on a scaffold around these high powered wires, and answered that they never did before the accident, but that they did since the accident. He was not present when the accident happened.

"Holder, a witness for the defendant, and superintendant of construction for twelve years, was familiar with the line in question and was in charge of its construction, prior to the construction of the Mississippi River Bridge.

"He testified that it is standard construction, the same type that is used throughout the State for this character of transmission line; and that wires covered, which carry 13000 volts, do not afford insulation and are not effective.

"Mabson, another witness for the defendant, Division Engineer, a graduate of Tulane University in Mechanical and Electrical Engineering, and employed by the defendant for ten (10) years, is familiar with the construction and operation of this line. He testified that it is regular standard construction to carry 13000 volts; that this line consists of three No. 2 copper conductors and the poles are a height of forty, forty-five and fifty feet; and the insulators are 17000 volts return and are fastened to the cross-arms by steel pins. It is a three-phase system and each wire is composed of three small wires, twisted together, making nine wires altogether. The distance from the ground to the top of the cross-arms is 38', and from

406

the top of the wires to the bottom of the bridge, 44'; and that the distance of the wires from the closest wire to the closest tower is exactly 5' 8" by actual measurement.

"The wires are not insulated or covered, they are naked wires. This witness testified that he considers it good practice and good construction, to erect a transmission line with wires that are not insulated that carry 13000 volts. That a distance of 5' 8" from the closest wire to the closest tower is approved by the National Electrical Safety Bureau, and approved by the United States Board of Standards. This is another Code, entirely different from the Underwriters Code; that this Code fixes the distance of five (5') feet as a sufficient distance from the towers to the wires, and this distance is permitted where the voltage is from 7500 to 15000 volts.

"The wire that Higginbotham struck with the piano wire is 13' 6" distant from the tower. He also testified that it is possible to insulate wires such as these, but it is not practical.

"He also stated that the New Orleans Public Service has the same system of construction in New Orleans, and they have voltages of 33000 going through New Orleans, in bare or naked wires.

"C. W. Ricker, an electrical engineer, head of the School of Electrical Engineering at Tulane University for ten years, with a Master's Degree from Harvard and a Bachelor of Science degree from the Massachusetts Institute of Technology, connected with the Western Electric Company in New York for one year, in transmission work, testified that he made an examination of the location where Higginbotham was killed on June 3, 1939. An objection was made as to the situation on that date, compared with the date of the accident. However, it had already been testified to that there was no change in the situation from the date of the accident up to the date of the trial, and that the wires and poles and everything were the same as of the date of the accident.

"Professor Ricker made an examination of the vertical and horizontal clearances, and took the measurements where the accident happened. He found the vertical clearance between the wires and the ground to be 38', and the measurement on the clearance between the wires and the lower edge of the bridge girder to be 44'. The measurement of the horizontal clearance between the wire and the pier which was involved in this accident, * * *, he found to be 5' 8", and he judged from the construction of the line that the average is around 13000 volts. He testified that this construction is standard construction * * *.

"He testified that the horizontal clearance between the closest line and the pier, which he found to be 5' 8", is in excess of the requirements of the Bureau of Standards by 8"; that he is familiar with the rules, and produced a National Electrical Safety Code, Fourth Edition, 1926, and the rule covering this particular case is Rule #234-D, which is entitled 'Clearance from Bridges', and that in this particular case, where the voltage is between 7500 and 15000, the required clearance is 5', and that the standard practice throughout the country in connection with a transmission line of the type involved in this case is to use bare wires on such lines, and it is considered good construction, and that it is not practical to insulate a voltage wire, carrying that much voltage * * *; that the trouble with the ordinary insulation which may be seen on wires in the streets today, is that it doesn't last for any length of time. It is ordinarily black waterproof insulation, and it serves all right in voltages up to 300 volts, and all you need is a clearance or a separation between the wire, but in high voltage wires, this weatherproof insulation cannot be relied upon, and he would not trust it when it is brand new; that you can observe this character of insulation hanging loose from wires around the City of New Orleans, so that it is necessary to go to a much more expensive type of insulation, if you are going to make the insulation effective. He testified that the Public Service in New Orleans now use bare wire in everything of 2000 volts and above.

"Some testimony was brought out in reference to warning signs on poles or places where transmission lines with this voltage operate, and the witness testified that the National Electrical Safety Code requires that in the case of an alleyway, lateral poles which would be easy to climb, especially in the location of schools and playgrounds, and other similar places, that warning signs be posted or that the poles be grounded in some way so as to prevent the climbing of them by children or anyone not knowing any better, but at the place where this accident happened, these

wires are sufficiently difficult to climb, so that it is not necessary to use warning signs, and that as a matter of fact, any person climbing one of these piers could not possibly be injured unless he deliberately reached out with a stick or threw a wire over the transmission line, because this transmission line wire is too far from the pier for any person to reach with his hand.

"In the opinion of this witness, this transmission line is constructed in accordance with the Code of the Bureau of Standards and is surrounded by all of the requirements for safety.

"There was also introduced in evidence a considerable amount of correspondence the object of which was to show that the Louisiana Power and Light Company had a permit to put this line under the bridge, and also to show that it had the approval of all of the necessary interests.

"There was also introduced in evidence a map, which was the map approved by the parties referred to in the correspondence, in which the distance of the power line involved in this suit, was to be placed at a distance of 13′ 6″ from the closest pier.

"Counsel for the plaintiff lays considerable stress upon the fact that the lines were not constructed at a distance of 13′ 6″ from the closest column to the bridge, and because of that fact the defendant was guilty of negligence and caused the death of Higginbotham.

"However, it appears to the Court that the only effect of having built the line further away from the tower, would have resulted in Higginbotham's piano wire coming into contact with the high-powered wire sooner than it actually did.

"It has been testified to, and is in evidence, that the wire closest to the tower was a distance of 5′ 8″. This naturally brought the other two wires closer to the tower and narrowed the distance correspondingly.

"Therefore, the fact that the wires were constructed at a distance of 5′ 8″ from the tower, instead of 13′ 6″, only resulted in the accident happening a few seconds later than it would have happened, had the wires been constructed 13′ 6″ away from the tower. As the situation existed, Higginbotham had to walk approximately 7′ 10″ further before he struck the high tension wire with the piano wire, than he would have had, to walk had the wires been constructed 13′ 6″ away from the tower.

"\* \* \*

"Taking the evidence and the facts into consideration, it was hardly possible for the power company to anticipate that a man would walk on the top of this bridge, with a piano wire dangling down to the ground, and come in contact with these high powered wires in such a way as to cause his death.

"The witnesses for the plaintiff, who were engaged with the deceased at the time in plumbing the bridge, both testified that they had passed this location many times, both on top of the bridge, walking on, or in motor cars, and also on the ground below, and that the deceased also passed in a similar manner. Therefore, they had notice and knowledge of the fact that there were wires running under this bridge, and it appears to the Court that to walk on the bridge in the manner in which Higginbotham did, with this piano wire dangling from his hands, in broad daylight, without taking the precaution to avoid hitting these wires, which he knew were there, would constitute negligence on the part of the deceased and his co-workers.

"The court has carefully reviewed the law on the subject, and I find that these same matters have already been before the appellate court in the case of Boudreaux v. Louisiana Power & Light Company, 16 La. App. 664 [135 So. 90], in which the Court held it was not negligence, if high tension wires, suspended thirty (30′) feet or more from the ground, were not insulated; that there was no legislation requiring insulation, and that there was no custom or law that required the posting of notice of the dangerous nature of the overhead wires."

The law of negligence has been admirably stated in a very few words in Article 2315 of the Revised Civil Code as follows: "Every act whatever of man that causes damages to another, obliges him by whose fault it happened to repair it".

It is not, however, every action which causes damage to another which constitutes a delict or fault, for the effects of which recovery may be had. Nor will the same fault always be actionable. It depends upon the surrounding circumstances. In other words, an action amounting to a fault in a given situation may be blameless under different circumstances. For example, in the use of an explosive

substance, such as nitroglycerin, in a coal mine far beneath the surface of the ground, or for blasting the roots of trees in wide open spaces, where the danger to human life or limb is so remote as not to be considered a reasonable consequence of the act, the actor could not be deemed guilty of negligence, but a similar performance in the public street of a populous city for the purpose of excavation, or otherwise, would be negligent. In the instant case, defendant's liability depends upon whether it was reasonable to contemplate that an uninsulated wire, thirty-eight feet above the ground, in the locality where the accident occurred, would be dangerous to the general public or to individuals whose occupation might require that they be brought into contact with it.

In 9 Ruling Case Law, pages 1213-14-21, we read: "It is only reasonable that the duty of providing insulation should be limited to those points or places where there is reason to apprehend that persons may come in contact with the wires, and the law does not compel electric companies to insulate their wires everywhere, but only at places where people may go for work, business or pleasure, that is, where they may reasonably be expected to go".

Plaintiff cites the case of Holden v. Cincinnati Gas & Electric Company, decided by the Court of Appeal of Ohio in 1937, and reported in 57 Ohio App. 448, 14 N. E.2d 943. There the plaintiff was allowed to recover for injuries sustained as a result of contact with an uninsulated wire which ran through a tree, which he had been trimming, because "a reasonable person would anticipate that these trees would be trimmed during the course of time and that to do so workmen would be required to climb thereon and get near these wires."

The case of Hoppe v. City of Winona et al., 113 Minn. 252, 129 N.W. 577, 578, 33 L.R.A.,N.S., 449, Ann.Cas.1912A, 247, also relied upon by plaintiff, was one in which the administrator of a deceased workman was allowed to recover against the La-Crosse Water Power Company, one of the defendants, for the death of the workman who, at the time, was employed in painting the steel girders of a bridge, when killed by a "disruptive discharge" from one of the wires of the defendant company which was on the bridge. The Court in its opinion said: "The power company was bound to take knowledge of the fact that it would become necessary from time to time to make repairs upon the bridge, particularly in painting the same, to prevent deterioration and decay from exposure to the elements, and in placing the wires thereon precaution should have been taken for the safety of those thus engaged. Byerly v. Consolidated [Light, Power & Ice] Co., 130 Mo.App. 593, 109 S.W. 1065. If the placing of the wires upon the bridge in the manner stated was an act of negligence, and likely to result in injury in some form, it is immaterial that defendant could not reasonably have anticipated injury in the manner disclosed in the case at bar. Christianson v. [Chicago, St. P., M. & O.] Ry. Co., 67 Minn. 94, 69 N.W. 640."

Neither of these cases is applicable here. There was no reason to believe that workmen on the Mississippi River Bridge would, by using a plumb-bob, come in contact with the live wires of the defendant company, forty-four feet below the bridge.

As to the necessity for placing warning signs on the river bank in the vicinity of the wire, which was some thirty-eight feet above the ground, we said, in Boudreaux v. Louisiana Power & Light Company, 16 La.App. 664, 135 So. 90, 91, that: "The record establishes the fact that the best modern practice does not require insulation of high-tension wires suspended as this one was, about 30 feet from the ground, nor is there any appropriate legislation requiring insulation. It does not appear that any custom or law required the posting of notices of the dangerous nature of the overhead wires and, moreover, the several members of the crew operating the crane were familiar with the danger involved. Consequently, notices and warning signs would have made no difference."

Our conclusion is that the judgment appealed from is correct, consequently, and for the reasons herein assigned, it is affirmed.

Affirmed.