|43 So. 28|

## HUGHES et al. v. SOUTHWESTERN GAS & ELECTRIC CO.

### No. 31529.

### July 20, 1932.

Wilkinson, Lewis, Wilkinson & Burford, of Shreveport, for appellant.

Jackson & Smith, C. B. Prothro, and Barksdale, Bullock, Warren, Clark & Van Hook, all of Shreveport, for appellees.

ST. PAUL, J.

Having attentively heard the arguments of counsel, and long and carefully considered the record and studied the briefs herein, we can find no manifest error of fact or of law in the conclusions reached by the district judge, or see wherein we can make any other and more correct disposition of the case than that made by him. His opinion, which we adopt, is as follows:

### Opinion of the District Judge.

Plaintiffs bring this suit to recover a total sum of $18,050, damages itemized as follows:

| | |
|---|---|
| Store building, etc. | $2,500.00 |
| Stock of merchandise | 2,500.00 |
| Store Fun. & Fixt. as itemized | 900.00 |
| Furnishings in bed rooms and kitchen | 500.00 |
| Wearing apparel, watch, jewelry, etc. | 100.00 |
| Abstracts of title to lands | 1,500.00 |
| One bale of cotton | 50.00 |
| Notes, accounts, etc. | 10,000.00 |
| Total | $18,050.00 |

They allege that prior to and until his death W. Clark Hughes was engaged in farming, ginning, and other things and owned, in community with Annie Oliver Hughes, a general store on the east side of the Bossier-Benton Highway and an interest in a gin on the west side of the highway, opposite the store; that defendant is engaged in generating, transmitting, and selling electricity for power, heating, and lighting, and maintained and operated a generating plant at or near Shreveport, and a system of poles, wires, and devices along the public highway between Bossier City and Benton over and through which it transmitted electric current of high voltage, dangerous to and destructive of life and property, with secondary wires connected thereto for diverting and transmitting lower voltage for industrial and domestic uses by and through which it supplied electricity for power and light in the gin and lights in the store; that on August 29, 1930, without warning, defendant negligently permitted electric current of high voltage, dangerous to and destructive of life and property, to escape, and as a proximate result of defendant's negligence in the construction, maintenance, and operation of its electrical plant and distribution system, electric current of high voltage did escape into, upon, along, and through the secondary wires and devices that connected the high-voltage line with the buildings before mentioned, and into, upon, along, and through said buildings, which charged them and all structures attached and adjacent to them with dangerous and destructive electric current and set them on fire; that the said W. Clark Hughes without knowledge that the buildings, etc., were charged with electricity,

in an effort to obtain water to put on the fire reached for the faucet on the cistern and was instantly killed; that defendant was informed of the perilous situation by telephone messages to its office and plant and otherwise, before the fire had caused appreciable property loss, and that in the exercise of proper care and prudence it should have cut off the current, in which event the property could have been saved, but that it negligently failed to do so, and allowed high-voltage current to escape for approximately an hour after notice, and completely destroyed the store and all contents and one bale of cotton on the outside; that the store and contents were insured for $1,700, which has been paid to the other petitioners by the insurance company and assigned and subrogated their claims for damages to said company; that the petitioners have suffered damages in the amount heretofore set forth, for which they should have judgment.

To this petition defendants first filed a plea to the jurisdiction ratione personæ, which was overruled. Defendant then filed a plea of vagueness to certain paragraphs of the petition, which was answered in an amended petition, and the plea overruled with reservation of a bill of exceptions by defendant. A motion to strike out was then filed and overruled, after which defendant answered denying the substantial allegations of the petitions. It specially denies that it was guilty of any negligence or fault of any kind in the construction, maintenance, or operation of its properties, and avers that its primary and secondary wires, transformers, wires, and other equipment and appliances, and particularly that used in serving the store and gin, and

other equipment in that vicinity, were carefully and properly operated and were constructed and maintained according to standard specifications commonly in use by others engaged in such business, and that all its equipment was in good order at the time of the occurrence described in plaintiff's petition.

Further answering, defendant says that one of the customers of the Hughes gin carelessly and negligently drove a wagon and team into a guy wire supporting the transformer pole, and in an effort to extricate the wagon, by continual jerking and pulling of the horses hitched to the wagon, the top of the pole began to sway, producing a swinging motion in the high and low voltage wires, causing them to come together, all without any fault or negligence of defendant.

It alleges that immediately on being notified of the existence of the fire, it dispatched its employees with great haste to the scene of the fire and the electric current was forthwith disconnected, but the fire was under such headway that it could not be extinguished, and denies any responsibility for the fire. That the accident would not have occurred but for the negligence of the customer operating the team and wagon, and that it was unable to foresee such wrongful conduct on the part of the driver of the wagon, and that deceased, his agents and employees, were negligent in permitting the driver of the wagon to trespass upon and damage defendant's property.

Further answering, it says it had nothing to do with wiring the store and gin, and that deceased in his application expressly assumed

all responsibility for the wiring of his said store and all appliances and was to keep them in good condition, at his own expense, and further obligated himself to give notice in writing of any defect in equipment, and defendant, on information and belief, alleges that the building was improperly wired, and had defective insulation, etc., which were unknown to it, and that but for these defects and the negligence of the driver of the wagon, the fire would not have occurred.

Three hundred and nine pages of oral testimony has been taken in the case, and several documents filed in evidence. The case has been argued orally and exhaustive briefs filed by both plaintiffs and defendant.

It is hardly possible to review all this testimony in detail. There is no dispute that defendant was serving the gin with power to gin and pack cotton, and the gin and store with lights. The lights for the gin, store, and Burt dwelling were all furnished from one transformer located on a pole on the east side of the highway. The power for the gin was furnished by the primary wires being strung across the highway and the railroad to a pole near the gin on which was located transformers for reducing the voltage to what was required for power for the gin, probably 220 or 230 volts. The lights for the gin were furnished by stringing the secondary or low-voltage wires between the same poles, 2 feet below primary or high-voltage wires. The plaintiffs claim that it was negligence to string the wires only 2 feet apart. The poles were about 184 feet apart, and the testimony is that the sag in the wires would, or should be, about 30 inches, to allow for contraction and expansion.

T. J. Caldwell, assessor of Bossier parish, who, together with his wife, and Mr. and Mrs. John Doles, were on the way from Benton to Shreveport and had reached a little north of the Burt residence when he saw a flash which he first thought to be lightning, but when it flashed the second time he thought the gin was on fire. When he reached the Burt dwelling, smoke was boiling up around the light pole nearest to it and also in the garage. When he got to the Hughes store, smoke was boiling up at the southeast corner of it, and Mr. Hughes came out and threw a bucket of water on what he thought was the fire and then tried to telephone defendant to cut off the current, but the telephone was out, and in a short time he was killed, apparently while trying to get water from the cistern to put on the fire. Caldwell says it was about 6 o'clock when he reached the store, anyway it was way before dark. He helped move some cotton. He says that he had been there probably ten minutes when Mr. Hughes was killed, and at that time it was quite a bit before dark. Smoke was coming from the eaves in front and from the gutter pipe, and there was a gas pipe coming through under the cistern and extending the whole length of the store, and about dark that pipe began to get quite hot. It would flare up and then go completely out, kept up probably fifteen or twenty minutes, and then the light wire going into the house would get quite hot. Seemed like the water falls at the fair shooting sparks down from it. It was way after dark when the store finally blazed, and it was only fifteen or twenty minutes until it had fallen in. He says it was forty-five minutes to an hour after Doles left for Vanceville before the store actually

blazed. He says it was about an hour and five minutes after Mr. Hughes was killed before any one from defendant's plant or office came to the scene; from the evidence it seems that Mr. Spencer had carried the body to Shreveport and returned to the scene of the fire before any · of defendant's employees reached the scene. The current was not cut off immediately when they arrived, because, as they say, they were first interested in saving a life, if possible. The damage was already done anyway when they arrived at the scene of the fire.

Mr. John Doles, who was in the car with Caldwell, testified to the same condition as Caldwell, with the addition that he went to Vanceville, about a mile away, and called defendant over telephone, and that it was about an hour before any of the defendant's employees got there.

W. C. Lindsey says he was at the gin when the trouble started, and that he stayed there 45 minutes and then went to his boarding house, and from there saw the store burning and went back to the store and it was practically consumed when he got there.

H. R. Grisham was at the gin with Lindsey. His version is about the same. He says they went to his home some 4 miles away, and ate supper, and went back to the store. Lindsey didn't go to the store until after supper. Grisham though did go over, and says he was only a few feet from Mr. Hughes when he was electrocuted.

John Nunn, a negro who carried three wagons loaded with cotton, hitched to one team, to the gin the day of the fire, says he was in the gin near Mr. Lindsey when the trouble commenced. He says the electricity flashed and the team ran, and that the back axle of the last wagon caught on the guy wire, and he went out and unhooked the team and got a fire extinguisher and went over to the store. He is evidently mistaken about the last wagon being the one that caught on the guy wire, because the photographs in evidence show that it was the bed of the second wagon that caught on the guy wire. He was no doubt excited and did not observe closely.

Grover Goines, another negro who had been working at the gin, testified for the defendant that he had a sore arm and was not working that day but was in the gin, and John Nunn was in one of the wagons driving out when the flames began, and that it was after the wagon struck the guy wire that the flashing began. He says the team ran away just as the last wagon was unloaded. He says the team had been running away all the fall. He says Nunn never came in the gin at all during the day, and that when the trouble began he ran out the south end of the gin and hid behind the seedhouse until Mr. Grisham called for some one to bring a fire extinguisher.

My idea is that the testimony of neither of these negroes is very reliable as to whether the popping of the electricity scared the team or whether the wagon struck the guy wire and caused the contact. The team must not have remained hitched to the wagon very long, because Nunn says he unhooked the team and went over to the store with a fire extinguisher, and was there when Mr. Hughes was killed, so if there was any jerking of the guy wire it did not continue long. Be that as it may, the conclusion I have reached

makes it immaterial as to whether the contact took place before or after the wagon struck the guy wire.

H. L. McAdams for defendant says he was night switchboard operator working on the day of the fire from 5 p. m. to 12:30 a. m., and that the first call he received was 6:55 p. m., and that he received several other calls after that; the first call saying the store was on fire and the next that a man had been killed or hurt. He tried to call Mr. Brusch, general foreman, and couldn't locate him, and when the second call came in he called Mr. Carroll, rural trouble shooter, and told him, and called Mr. Barron at Plain Dealing.

Brusch says he learned of the trouble between 7:05 and 7:10 and that he got to the fire at 7:20 and the current was cut off at 7:25. Brusch and Carroll then made an inspection and found the top secondary wire entwined with the middle primary wire, and they cut the secondary line down.

The testimony of McAdams, Brusch, and Carroll as to time of notice is inconsistent with the testimony of Caldwell and Doles, and from a consideration of all of the testimony in the case I am of the opinion that much more than twenty-five minutes elapsed from the time of notice until any of defendant's employees reached the scene. It seems that Spencer had carried Mr. Hughes' body to Shreveport and returned to the scene of the fire before Brusch and Carroll arrived, and McAdams says the first report he received only mentioned a fire and it was the second one that mentioned an injury to a person. However, the conclusion I have reached, in my opinion, makes this of no great importance.

The testimony of the experts in this case, as in all others that have been before me, is conflicting; plaintiffs' experts contending that the hanging of the secondary wire only 2 feet from the primaries was improper construction, and defendant's experts contending that this construction is standard approved construction as provided by electrical standards. As said above, I do not know whether the wagon striking the guy wire was the cause of the contact of the primary and secondary wires or not. The fact remains that they came in contact about over the railroad and must have welded together.

Mr. Hill, defendant's superintendent, was asked on cross-examination:

"Q. How do you account for that high voltage continuing into the Hughes store for approximately one hour?

"A. It was not possible.

"Q. How do you account for the continued sparking and bright glimmer of the metal parts that were passing through the store for approximately an hour?

"A. That is laughable, Mr. Warren."

Later he said on redirect examination that when electricity gets out of its proper path anything is apt to happen. He says that the wires of the primary line over the railroad had more than the usual sag in them the next morning and concludes that this was caused by the wagon striking the guy wire. This may or may not be true. These wires may have had more than the usual sag before the accident.

Without further discussion of the evidence, my opinion is that the primary and secondary lines ought not to have been strung

from the same poles a span of 184 feet, with 30-inch sag, 2 feet apart. I am supported in this by the fact that where there was no railroad and highway which had to be cleared a certain number of feet, these wires were placed some 5 or 6 feet apart. Longer poles ought to have been set for this crossing. It is argued that because no trouble had occurred before this proves the construction correct, but I do not agree with this reasoning. I am of the opinion that it was negligence to so construct and string these lines.

■ Defendant contends that even if it is held that it was negligent in this, that no recovery can be had, because the injury and damage was caused by the intervening negligence of a third person, the negro with the team and wagons, over which it had no control, and for whose acts it is not responsible. The cases cited by defendant do not appear to me to be applicable to the case at bar. It seems unnecessary to take up all the cases cited for discussion here. A case that seems more applicable to the case at bar is Stumpf v. Baronne Bldg., Inc., et. al., 16 La. App. 702, 135 So. 100, 101. That is a suit by a tenant of the building for injury received while riding in an elevator of the building. The petition alleged that while riding in the elevator which was not equipped with gates or doors, another passenger ignited a box of matches in trying to light a cigarette and threw them in the face of plaintiff, who in attempt to step away from the fire was precipitated beyond the limits of the elevator doorway with resulting injury when his hand struck projections on the wall of shaft. He alleges that the injuries were caused solely and proximately by the carelessness and negligence of defendants, set forth as:

" '(a) Failure on the part of defendants herein to provide a guard, gate, door, partition or suitable protection at the entrance to said elevator car.

" '(b) The negligence of defendants, their agent or employee, in throwing the lighted box of matches into petitioner's face.

" '(c) The violation of its duty of safe carriage owed to petitioner, and its duty to use the utmost care and diligence for the protection of passengers, and its failure to equip said elevator car with the protection and modern equipment with which present-day elevators should be equipped.'

"Both defendants filed exceptions of no right or cause of action, which were sustained, and from a judgment dismissing the suit the plaintiff has appealed. The exception of no cause of action is based upon several grounds:

"First, that the failure to equip the elevator car with the protecting doors was not the proximate cause of the accident;

"Second, that if defendant was negligent in failing to provide the elevator car with a door, the plaintiff had assumed the risk because of his tenancy in defendant's building; and,

"Third, that the obligation of defendant as owner of the building and operator of the elevator was to exercise ordinary care, and his duty in this respect was fully discharged by the operation of an elevator car without a door.

"We shall discuss these issues in the above order.

"The first contention concedes, arguendo, that it was negligence on the part of defend-

ant not to have had a guard rail or a collapsible door on the elevator car. It is argued that such negligence was not the proximate but the remote cause of the accident; that the proximate cause of the accident, without which it would not have happened, was the negligent act of the person lighting the cigarette and igniting the box of matches and throwing it into the lap of the elevator operator.

"The rule of law is that a party is responsible for the reasonably to be expected consequences of a negligent act, but, where an intervening, independent act of negligence breaks the chain of causation, then the proximate cause is the act of intervening negligence, and not the original act of negligence. This rule, as stated in Weeks on Damnum. Absque Injuria, § 115, p. 230, and quoted with approval in Moore v. Edison Illuminating Co., 43 La. Ann. 792, 9 So. 433, and in Bemiss v. Railroad Co., 47 La. Ann. 1675, 18 So. 711, 713, is as follows:

" 'In actions for injuries through negligence, it is a general principle that a person is answerable for the consequences of his negligence only so far as they are the natural and proximate result of the injury, as might have been anticipated by ordinary forecast, and not for those consequences arising from a conjunction of his faults with circumstances of an extraordinary nature.'

"In this case the alleged intervening act of independent negligence was the throwing of the box of lighted matches, which caused the plaintiff to lurch forward and to engage his hand in the elevator shaft, causing the injury sued for. It is said that the absence of the gate is the remote and not the proximate cause. It would appear to us * * *

that the failure to provide a door on the elevator car might reasonably result in some such accident as that experienced by the plaintiff in this case." Citing Munsey v. Webb, 231 U. S. 150, 34 S. Ct. 44, 58 L. Ed. 162, which discusses numerous other cases.

On the question of cutting off the current immediately when notified, defendant contends that there is no testimony to show that the fire would have been prevented if the current had been cut off. I do not agree with this. The testimony shows conclusively that at the time Mr. Hughes was killed the fire had not broken out, and that it did not break out for some time after. Defendant had notice of the perilous situation before he was killed and afterwards, as admitted by its own employee on the witness stand, and the uncontradicted testimony of T. J. Caldwell is that Spencer had carried Mr. Hughes' body to Shreveport and had returned to the scene of the fire by the time any one of defendant's employees arrived. The distance from the store to Shreveport is about nine miles, and a conservative estimate of the time necessary to take the body to Shreveport and return would be thirty minutes. It is argued that the current could not be cut off at the plant, because to do so would cut off part of the street car system and several hospitals and other customers who could not be cut off except under the direct circumstances; but it is shown that there is a cut-off just outside the city limits of Bossier City which would disconnect the rural line only. My opinion, from all the evidence and circumstances of the case, is that McAdams, the switchboard operator, had trouble locating any one to send out, and I think he is mistaken about the time he

received the call. It must have been longer than twenty-five minutes after he received the call before Brusch and Carroll reached the store. My opinion is that if reasonably prompt action had been taken to cut the current off at the shed road, the fire would not have occurred.

On the quantum of damages, it is my opinion that the following sums were proven with sufficient certainty to form the basis of a judgment:

| | |
|---|---|
| Merchandise ....................... | $1800.00 |
| Store building.................... | 1700.00 |
| Abstracts ........................ | 1267.50 |
| Scales ........................... | 150.00 |
| Cash register.................... | 40.00 |
| Furnishings and wearing apparel.. | 150.00 |
| 4 showcases at 25.00 each.......... | 100.00 |
| Counters ........................ | 50.00 |
| Desk ............................ | 50.00 |
| Typewriter ...................... | 50.00 |
| Adding machine................... | 25.00 |
| Oil tanks........................ | 50.00 |
| Safe ............................ | 200.00 |
| One bale of cotton............... | 50.00 |
| Total ........................ | $5682.50 |

On the question of damages for the loss of the notes and accounts, some evidence was admitted under objection of counsel for defendant, and which objection I considered good at the time, and still consider good, but which was admitted to preclude the possibility of having the case remanded for a new trial on that ground. I am unable to agree with counsel for plaintiffs that this item can be made the basis of a judgment. It is true that judgment may be had for injuries where it is impossible to fix the amount in dollars

and cents with certainty, such as for pain and suffering, loss of time, and prospective loss of earning power on account of partial or total disability in personal injury cases, but the authority cited is not, in my opinion, applicable to a case such as the claim here for the loss of the notes and accounts. There is no proof of the amount and, of course, no proof that they would be collectible if they had not burned.

My opinion is that the plaintiffs ought to have judgment for $5,682.50, with 5 per cent. per annum interest from judicial demand, until paid to Globe & Rutgers Fire Insurance Company and the balance to the other plaintiffs with costs of the suit; $1,700 of the amount to be paid to Globe & Rutgers Fire Insurance Company and the balance to the other plaintiffs, in the proportion of one-half to Mrs. Annie Oliver Hughes and one-sixth each to Elizabeth Hughes Tucker, Margery Hughes O'Kelly, and Martha Hughes Dowdell, and it is so ordered.

### Decree.

For the reasons assigned the judgment is affirmed.