Plaintiff seeks judgment against defendant for the value of his mule that was killed when it contacted a line of uninsulated barbed wire, charged with electricity, which enclosed defendant's pasture. The right to recover is predicated primarily upon the proposition that it was negligence per se to allow a current of electricity of *Page 659 
sufficient voltage to kill livestock to be conducted over said wire.
Defendant denies that he was negligent to any extent in maintaining the charged wire around his pasture and avers that in diverting current from wires in his dwelling to said pasture wire, he employed approved equipment to the end that a dangerously high current would not reach the pasture wire. He denies knowledge that at the time the mule was killed the wire was carrying voltage sufficient to do so. In the alternative, defendant avers that the agents of plaintiff knowingly and carelessly ran the mule into the wire fence, being aware at the time it was charged with electricity, and that their negligence in this respect bars recovery by him.
Judgment was awarded plaintiff and defendant appealed.
The facts of the case are not in dispute. Plaintiff leased three mules to Mr. B.M. Alexander who lives not far from defendant's place at Bethany near the Louisiana-Texas State line. Two of the mules, including the one killed, were kept at night in an enclosure at the Alexander home. On the morning of February 16, 1945, it was discovered that a gate to the enclosure was open and the mules were out. They were located by Mrs. Alexander on the highway south of defendant's property. She undertook to drive them back to her place, but the mules turned north and headed toward defendant's pasture fence some three hundred (300) feet away. The pasture fence was two and one-half (2 1/2) feet from the ground and was affixed to posts. However, the wire at one place was disengaged from one or more posts and this allowed it to sag to within a few inches of the ground. At this point the mules entered the pasture.
Mrs. Alexander, after realizing her inability to drive the mules back to her place, solicited the assistance of some colored boys who had been attracted to the scene. Three or four of them pursued the mules as they scampered over the pasture for the purpose of catching them and returning them to Mrs. Alexander. The mules turned southerly at a corner of the pasture fence and proceeded toward a cross fence thirty-five (35) feet away. The mule that was killed ran or walked into the wire at the point of intersection of the fences, knocked down a post and became entangled in the wire. The electrical shock knocked him down, but he struggled to arise and partially succeeded only to again fall upon the ground, after which he arose no more. It was found that the wire ran between front and rear legs of the animal and contacted his breast and one side of the neck. The odor of burning hair and flesh was detected by some of the witnesses.
Defendant began to charge his pasture fence with electricity several years ago. He did so to keep his own cattle in the pasture as ordinarily one line of wire so charged was sufficient to do so. The mule in question was the first animal to be killed from contact with the pasture wire.
Defendant graduated from the College of Electrical Engineering at the University of Texas, and, of course, has knowledge of electricity far beyond that of the general run of laymen. His residence, which is not over one hundred (100) feet from where the mule was killed, is supplied with electricity from a high power line. The voltage therein, by means of a transformer, is reduced to 110. He supplied his pasture fence with current by attaching a wire or wires to some part of the wiring and attachments within his dwelling. To reduce the voltage to less than 40 he employed a small transformer. The amperes were five. He testified that if the voltage and the amperes for any reason are combined, there results lethal effect; that is, current of sufficient power to kill animals and human beings. But, contact with the pasture wire when carrying a current no greater than designed produced only a slight shock to live stock that caused them to withdraw from it.
It was a financial advantage to defendant through the electric current to keep his live stock safely within the pasture limits. It relieved him of having a more expensive fence.
It had been raining the morning the mule was killed. He was wet at the time. Defendant admits that under the existing conditions, the mule and ground both being wet, conduction of electric current was better than if both had been dry. He also admits that the greater the area of contact the greater the current that passes through the object. In other words, since the wire was against the mule's body for several feet, a much heavier current passed through him than would have passed through by ordinary contact.
Defendant admits that he tested the current going into the pasture wire only at intervals *Page 660 
of about thirty (30) days and that it had been this long prior to the accident when he made the last test. He admits that about one year prior to the date of the accident he so manipulated the electrical equipment that a dog was electrocuted in his chicken house. He gave the following testimony, which well reflects the potentially dangerous character of the wire in question, to-wit:
"Q. How many volts did you have in this wire? A. Less than forty volts.
"Q. How many amperes? A. Could not have been over five because it went out through a little transformer.
"Q. But if you combine the two, it kills? A. Yes. "Q. It is not necessarily the voltage? A. Correct —
"Q. When you get amperes and voltage together then you get lethal effect? A. Yes.
"Q. Also, don't the effect vary? A. Yes.
"Q. You can touch a wire that's hot and it won't hurt much? A. Yes.
"Q. But, in case a mule hits it, with the wire stretched along his body from the neck to his back legs, then you have got increased voltage or charge; is that not right? A. Yes.
"Q. A mule might get by without any effect and yet if he had a wire along his body it might kill him? A. Yes.
"Q. You say you never had any animals killed. You never have seen any, have you, in the condition in which this mule has been described? A. No.
"Q. With this wire stretched along his body? A. No.
"Q. And between his legs from his neck back to his back legs? A. No.
"Q. That would make a difference in the voltage? A. I imagine it would make a difference, yes.
"Q. This dog you say was killed, just touched the wire? A. He caught the wire in his mouth.
"Q. That makes a difference? A. Yes."
[1] The high degree of care that rests upon a person who produces and distributes electrical energy is well known. See Scott v. Claiborne Electric Cooperative, Inc., et al., La. App., 13 So.2d 524, and cases and text books therein cited. The rule of care is stated in 29 Corpus Juris Secundum, Electricity, 575, 576, § 39, as follows:
"Due to the deadly and latently dangerous character of electricity, the degree of care required of persons, corporate or individual, furnishing electricity to others or otherwise maintaining electric wires and appliances has been variously stated. It may be stated as a general rule that one maintaining electric wires and appliances is required to exercise such care as a reasonably prudent man would exercise under the circumstances, or care commensurate with, or proportionate to, the danger. It may be that the degree of care is properly defined as ordinary or reasonable care, but what constitutes ordinary care increases as the danger increases."
[2] And, surely, that same degree of care and caution rests upon one who diverts electrical current from his own premises and charges uninsulated wire fencing therewith. The person so doing unquestionably takes upon himself the definite obligation of seeing to it that at all times and under all conditions the current is maintained at such voltage as to be harmless to animals and persons who may come in contact therewith, and his failure to do so renders him responsible for damages resulting therefrom.
It is impossible to determine exactly what happened to the electrical current from defendant's house to the pasture fence to increase the voltage, but, evidently, a much greater voltage was passing through when the mule was killed than defendant had intended, or the voltage and amperes, for some reason, combined and produced lethal effect. The fact that this young twelve hundred (1,200) pound mule was instantly knocked down when he ran into the wire is convincing evidence that a very high current prevailed. The ground and body of the mule being wet, possibly contributed to the result.
[3] We will not say that the use of electricity to charge fencing, as appears in this case, is negligence per se, but we do say that the duty devolved upon the defendant to frequently test the power of the current going into the wire to the end that any increase therein could be detected and remedied. He admits he did not do this. Being educated in electrical engineering he was competent to do this and there is no good reason why he should not have employed *Page 661 
his scientific knowledge in discharge of the obligations that obviously rested upon him in the respect mentioned.
[4] The plea of contributory negligence is without merit. The negro boys who chased the mules to catch them were not acting for plaintiff; neither was Mrs. Alexander. In passing, it may be said that had defendant's fence not been down the mules would doubtless not have entered the pasture and the accident would not have happened.
Neither side complains of the value of the mule as fixed by the court. The testimony amply supports this value.
For the reasons herein assigned, the judgment appealed from is affirmed with costs.
KENNON, J., takes no part.