TALIAFERRO, Judge.
The learned trial judge has favored us with written reasons for the judgment rendered by him in this case, wherein he clearly marshals the essential facts, resolves them against the plaintiff, and applies law appropriate thereto. We adopt said reasons as our own, supplementing same to the extent we deem necessary, the whole to constitute the opinion of this Court, viz.:
“This suit is action in tort by the plaintiff against the ICity of Alexandria, seeking damages for personal injuries which he sustained on June 9, 1945, which damages were sustained by the plaintiff under the following conditions and circumstances:
“The City of Alexandria owns and operates its water system in connection with its other public utilities and in connection therewith owns and operates a pumping station approximately seven miles out in the country from the city limits. The pump house is a small brick structure which is shown in the different photographs, which are found in the record.
“Approximately seventy or seventy-five feet from the pump house is a transformer station which is necessary for the operation of the pumps and electric lights about the premises. The electric wires lead off from poles at the transformer station and entered the pump house. There were eight wires, six being what is referred to in the testimony as primary wires which carried 2300 volts and two wires which carried 110 volts and referred to in the testimony as secondary wires. They will be referred to as such in this opinion. The primary wires were not insulated and left the poles at the transformer station twenty-four feet above the ground and directly beneath them at a distance of six feet the secondary wires left the poles and all of them entered the pump house at the same level of 10% feet above the level of the ground. In other words, seventy or seventy-five feet away there was a perpendicular difference between" the wires of six feet and they gradually converged to the same level at the pump house. Laterally the secondary wires entered the pump house two feet to the left of the primary wires looking from the transformer station to the pump house. The primary wires were fifteen inches apart at their entrance. The secondary wires were insulated and it seems from the testimony that all of the wires carrying low voltage are ordinarily insulated. There was no evidence as to the reason for the high voltage wires not being insulated but I assume that because of their size they are hot usually insulated.
“In 1945 this area suffered from flood waters and it was necessary to build a levee by means of sand bags around this pump house. As the primary wires were 10% feet above the ground at that point, the City protected the workmen who might come in contact therewith in the use of spades and similar instruments, by placing a loose rubber covering over those wires which extended out ten or twelve feet from the building. They are referred to in the testimony as rubber guts and from the testimony it appears that they remained thereon until the time of this accident.
“Because of the fact that the elevation of the ground at the pump house was too low the City entered into a contract with Vardaman Ferguson to haul dirt and to build up and raise the elevation around the pump house to a height of approximately three feet at the house and tapering off to a zero point one hundred feet in every direction around it. Mr. Ferguson employed trucks to haul dirt and a bulldozer to spread the same in this process. Mr. Coulon, the plaintiff, was the operator of' the bulldozer and while operating underneath the wires both of his hands came in contact therewith and practically burned them off' and this suit followed.
“The insurance carrier for Mr. Ferguson intervened for compensation which it had paid the plaintiff and which, is set out in detail, both in the pleadings and the evidence/and concerning which there is no controversy.
*173 "There is a sharp controversy as to how the accident happened and the able counsel for the plaintiff urges neg'ligence on the part of the City of Alexandria as the proximate cause of the injury. The principal controversy concerns the facts immediately connected with the injury but none as to the extent of the injury for the plaintiff was very painfully and severely injured. Fortunately, he did not lose his life. The fact that he did not seems miraculous.
“The City of Alexandria realized that it was dangerous to conduct the operations in close proximity to the primary wires and provided a guard to be on duty at all times to warn all of the employees of the dangerous nature of the operation near the wires and to warn them sufficiently to keep them from coming in contact therewith. Counsel for the plaintiff rest their case largely upon the contentions that the wires sagged between the transformer station and the pump house and were not sufficiently raised from the ground to prevent injury to the employees and especially were they lower than provided by safety rules of United States Department of Commerce, which rules were introduced in evidence and provide for a clearance of twenty feet between such wires and the ground. Further, that the City placed guards at the scene to prevent workmen from coming into contact with the wires and that they were negligent in the performance of their duties in permitting the plaintiff, who was ignorant of the danger, to continue to operate underneath them and to gradually raise the level of the ground to a sufficient height to ■bring the plaintiff and his machine to such close proximity that while he was spreading dirt underneath the wires he was suddenly confronted with wires in his face and threw up his hands to ward them off; as he threw his hands up against the wires they came in contact with the primary wires and resulted in the injury. They further contend that Coulon had no knowledge of the high voltage wire or the danger that might result in coming in contact with them, that they negligently failed to protect him and he came in contact through the negligence of the City and through no fault of his.
“Due to the conclusion to which I have come after careful study of this record, I do not deem it necessary for me to pass- on whether or not the City was negligent. I shall not attempt to analyze all of the evidence in detail. To do so would unnecessarily lengthen this opinion. I am of the opinion that- the plaintiff was negligent and that his severe injuries were due to that negligence which was the proximate cause of the accident.
“The wires from the transformer station undoubtedly sagged as might be expected of all wires. The evidence showed that approximately twelve feet from the pump house the secondary wires were underneath the primary wires a distance of approximately six inches. Of course, that distance increased as you follow the wires back towards the transformer station. The evidence shows that a short time 'before the accident the employees of the City of Alexandria had raised three of the primary wires by raising a temporary cross arm.' Witnesses for the plaintiff gave negative testimony in that they had not observed the same, but I am of 'the opinion that it is of relative unimportance for the reason they did not raise all of the primary wires and did not raise the two secondary wires which continued to hang approximately eight or nine feet above the ground at a distance of approximately twelve feet from the pump house. The guards had specifically warned the plaintiff of the danger of coming in contact with the primary wires and on the day before the accident one of them had thrown -clods of dirt at him to warn him from time to time. This was due to the fact that the noise of the bulldozer made it necessary. He had also been asked by one of the guards to warn the truck drivers while' the guard was absent at lunch. I think it is very evident from the testimony that everyone on the premises, including the plaintiff knew of the danger of coming in contact with these wires. Beyond this it would seem to me to be self-evident and to be a matter of common knowledge that all electric wires are dangerous and especially was this true at this particular spot for the reason that there was a transformer station near the *174 pump bouse and that electric pumps were being operated by the energy transmitted through the wires. Being therefore convinced that the plaintiff, as well as all other workmen had this knowledge, I will consider the circumstances at the moment of the accident.
“I am convinced from the evidence that Mr. Coulon drove his bulldozer underneath the wires at approximately twelve feet or more from the pump house. Undoubtedly, the secondary wires, which ordinarily hung below the primary wires, were so low that he felt that his bulldozer, which was approximately eight feet high, might come in contact therewith and that he stopped his machine directly under those wires and attempted to lift them with his hands. I am of this opinion because after the accident the machine, with no evidence of having touched any wires, was stopped at this immediate spot and had he not manipulated the mechanism for the purpose of stopping it, it would have continued to move forward. A guard who was watching saw him stop, stand and take hold of the secondary wires as if to loop them over the higher primary wires. Mr. Flynn, a City employee, was standing with Mr. Doss, a guard, a few feet away. As the plaintiff attempted to perform this dangerous act Mr. Doss ran to a nearby switch to break the current. He did so for the reason that he knew if the plaintiff touched the primary wires he would in all probability, lose his life. I am further convinced of the correctness of my conclusion by reason of the fact that the secondary wires were burned at that particular point and a part of the plaintiff’s glove was hanging to the secondary wires ■ after the accident. Had the secondary wires not come in contact with the others there would not have been any burning and, of course, if the plaintiff had not come in contact with them he would not have been injured.
“Plaintiff approached the wires from the west. It was on that side the secondary wires were hanging. If he or his machine entangled with any wires it would have been first with the secondary wires. There was no evidence that the bulldozer entangled with any of them. Plaintiff’s head was well below the top of the frame of the bulldozer and I cannot see how any wires suddenly appeared in his face. However, if that be true it would necessarily have been the harmless secondary wires.
“Had the plaintiff not taken hold of the secondary wires and attempted to hang them over the upper and primary wires, which I believe he did, and for the sake of argument admitting that not to be true, the plaintiff, knowing that these wires were dangerous, stopped his machine underneath the wires and so close underneath as to enable him to reach them with his hands, and then to deliberately do anything with them, was such negligence as to bar his recovery. It is my opinion that the evidence shows clearly his negligence and that it was his negligence which was the' proximate cause of his injury.
“I cite no authorities for the legal conclusion to which I have come as they are so well known that the principle is axiomatic to the effect that where the plaintiff’s negligence is the proximate cause of the injury he cannot recover regardless of any negligence on the part of the defendant.”
Plaintiff admitted, with some equivocation, that the bulldozer was stopped under the wires in a normal manner, to-wit: by operation of the proper lever with the left hand. Therefore, it is clear that he caught hold of the wires after the bulldozer was stopped. It is certain he could not have manipulated the lever after contact between the left hand and the wires.
He had been operating the machine over the lot and under the wires for three or four days. The gradual raise in the lot’s elevation, reduced the distance between it and the wires, near the pump house, to such extent that the A-frame would not clear the secondary wires. He had ample time and opportunity, after the secondary wires contacted the A-frame, to have put the machine in reverse and backed it to a zone of safety. This movement would have entailed only a few feet. Instead of pursuing this course, he allowed the bulldozer to remain at stop, with motor running, *175 stood erect and deliberately took hold of the wires. The shock then followed.
It is argued, in effect, that no one of sound mind would have acted as defendant charges plaintiff did after the wires contacted the A-frame. It is not intimated that plaintiff is not well balanced mentally. However, the well established facts prove that he did exactly as charged. His conduct may be explained only on the theory that for the moment he became oblivious to the lethal potentiality of the primary wires. It requires some stretch of the imagination to so conclude, but this must be done or else conclude that he intended self-destruction. We are sure this was not intended.
Plaintiff cites several cases in which damages were awarded because of death or bodily injury due to contact with electric wires carrying heavy voltage including: Layne v. Louisiana Power & Light Co. et al., La.App., 161 So. 29; Potts v. Shreveport Belt Railway Co., 110 La. 1, 34 So. 103, 98 Am.St.Rep. 452; Whitworth et al. v. Shreveport Belt Railway Co., 112 La. 363, 36 So. 414, 65 A.L.R. 129; Clements v. Louisiana Electric Light Co., 44 La.Ann. 692, 11 So. 51, 16 L.R.A. 43, 32 Am.St.Rep. 348; Myhan v. Louisiana Electric Light and Power Co., 41 La.Ann. 964, 6 So. 799, 7 L.R.A. 172, 17 Am.St.Rep. 436.
But, in each of these cases the facts are largely dissimilar to those of the instant case. In each contact and death or injury were instantaneous, and in each instance the victims were unaware that the dangerous wires, near to which they worked, were inadequately insulated or wholly uninsulated, or that there was a leak in the current to which the tragic result was traceable; whereas, in the present case the plaintiff knew of the presence of the highly charged wires and, of course must be held to have known that they were not insulated at all. This was obvious from casual observation.
There can be little or no doubt that the primary wires were negligently placed and negligently maintained. The City fully realized this to be true. The rules of the Bureau of Standards of the Department of Commerce require at least twenty feet clearance between wires of this character and the ground. This rule was not observed. Prior to the beginning of the task of raising the level of the lot, the City did raise three of the six primary wires a few feet. It is not shown why the other three were not also raised. Within forty-eight hours after the accident all six of these wires were raised to a level of safety and were attached to a permanent structure. Had the wires, at time of the beginning of the work, not been considered dangerous to motor vehicles engaged therein, the employment of guards to warn the operators would not have been resorted to. Regardless of all of this, had plaintiff exercised ordinary care for his safety, the accident would not have happened. We conclude, as did the trial judge, that his own negligence was the efficient, proximate cause of the accident and the City’s negligence the remote cause. In so holding we are not unmindful of the high degree of care, for the safety of others, imposed upon all persons who generate, transmit and sell electric energy.
In this Court plaintiff invokes the doctrine of the last clear chance. It was not pleaded below. This plea is predicated upon the proposition that defendant’s guard saw plaintiff as he stopped, stood erect and took hold of the secondary wires, then being in a position of peril, and failed to warn him thereof. It is shown that when the guard did realize what plaintiff was about to do, he holloed loudly at him and beleiving he was not being heard, at once rushed to the switch, some fifty feet away, and thereby saved plaintiff’s life. Under this state of facts we think the doctrine not applicable. In the first place, the conclusion is inescapable that plaintiff must have known that it was perilous to undertake to do that which he actually did, and, in the second place, since the effort to warn him was abortive, further effort would only have additionally jeopardized his life’.
Exceptions of no cause and no right of action were filed by the City and overruled (with written reasons) by a judge of the lower Court other than the one who presided when the case was tried on its merits. *176 Counsel for plaintiff argue that this opinion correctly reflects the facts of the case and cites law appropriate to them. They, in effect, contend that there is conflict between this opinion and that rendered on the merits. We do not share this view.
In paragraph 14 of the petition, it is alleged: “That petitioner knew that defendant’s employee was placed on the job to warn Ferguson’s (the man who was contracted with to do the work) employees, including petitioner, in the event they approached too near the wires and that petitioner relied on the faithful performance of this duty and timely warning in the event of danger.”
He further alleged (in paragraph 15 of the petition) that the City failed in its duty by not apprising him of the presence of the dangerous wires and by not warning him thereof when the machine he was operating came in close proximity thereto. The Court’s ruling on the exceptions, of course, was based upon the allegations of the petition, especially those to the effect that plaintiff was ignorant of the potentially dangerous wires because he had not been warned thereof by the City’s employees, whereas the judge who presided at trial on the merits expressly held that these allegations were untrue, as plaintiff had been warned and had knowledge of the fact that the primary wires carried voltage dangerous to human life. Obviously, there is no conflict between the opinions. From plaintiff’s own allegations it is clear that he was wise to the fact that the primary wires were dangerous since he alleged that “he knew” that the City had employees on the job “to warn” the contractor’s employees thereof.
For the reasons assigned, the judgment from which appealed, is affirmed with costs.
KENNON, J., dissents, giving written reasons.