56 So.2d 862 (1952)
CALTON
v.
LOUISIANA POWER & LIGHT CO.
No. 7769.
Court of Appeal of Louisiana, Second Circuit.
January 30, 1952.
Rehearing Denied March 30, 1952.
*863 Campbell & Campbell, Minden, Dimick & Hamilton, Shreveport, for appellant.
Theus, Grisham, Davis & Leigh, Monroe, for appellee.
GLADNEY, Judge.
From a judgment rejecting plaintiff's demand this appeal is prosecuted. Suit was brought by the mother of George Sterling for damages arising from his accidental death by electrocution on February 14, 1949. At the time of the accident Sterling was employed as a helper upon a machine known as a log loader belonging to Pace Brothers Lumber Company, Inc., which company operated a sawmill about four miles north of Minden on what is known as Dorcheat Highway. There was erected upon the log loader a boom which contacted defendant's high voltage electric line when the driver of the loader was attempting to take the machine under the line. Sterling, after dismounting from the loader, touched the charged machine, thus bringing into his body enough electricity to cause his death.
There is no serious dispute as to any of the material facts. Near the scene of the accident a gravel road takes off from the Dorcheat Road running northeasterly into the property of the sawmill company. Defendant's electric line, charged with 13,800 volts between wires and 8,000 volts to ground, crosses the sawmill property near its south edge. The line is what is described as a three-phase grounded circuit, consisting of three conductors or wires which carry electricity, and a fourth wire which is a neutral or ground wire, the purpose of which is to ground the circuit, but which does not carry electricity. In order to furnish lights for the sawmill, some years ago the defendant company constructed a small line which was adequate for such purpose. Later when the mill constructed a planing mill, a high voltage line was required in order to supply this demand. The line so constructed crosses the road, referred to as the mill road, and on which the accident occurred, at a sharp angle. At the time of the accident, the first span coming off the blacktop or Dorcheat Road was 482.5 feet in length, that is to say there was this distance between the first and second poles. On the Dorcheat Road the wires took off from a 40' pole set 6' into the ground, the wires being strung on an 8' cross arm, set approximately 4' from the top of the pole. The effect of this was to place defendant's electric line approximately 30' from the ground, when measured near the pole. The next pole to the east was a 35' pole set 5½' in the ground with the wire strung on a cross arm located 6" from the top of the pole, causing the elevation of the wires at that end of the span to be 29' above the ground. The gravel or mill road crosses under this span approximately in the middle. Defendant's line at the point of crossing and the place where the accident occurred was at the time of the accident slightly more than 23' above the ground.
The log loader upon which the deceased was employed and which was involved in this accident, consisted of the metal frame of a Chevrolet truck, with a boom hinged on the back end, which could be raised or lowered by means of a Ford motor fastened to the framework of the truck behind the driver. The boom on this loader was 19' 10½" in length and was hinged to an "eyebeam frame" 42" from the ground, and at the time of the accident was being carried in its normal operating position, which was at an angle of about seventy-five degrees or eighty degrees. When extended *864 straight up in the air the overall height of the boom from the ground would be 23' 6½"; at an angle of eighty degrees the tip of the boom would be 3½ lower; and at an angle of seventy-five degrees it would be 6.7 inches lower than in the vertical position. It would, therefore, appear that this log loader as it was being carried at the time of the accident, could not safely pass under the line at this point, and due to any uneveness of the road it could be expected to make contact with the line.
On the morning of the accident the log loader had been carried out into the woods and when the accident took place it was being returned to the lumber yard. When the log loader left the yard in the morning the boom was lowered in order to pass under the line. The boom was lowered by means of a motor on the truck, operated by the driver, which operation is preceded by the removal of a pin which holds the pipe on which the cable supporting the boom is wrapped. When lowered on its outward trip, George Sterling took out the pin which held the pipe. On the return trip to the mill Mr. Bailiff, the driver, undertook to drive the log loader under the line without lowering the boom. As Bailiff approached the line George Sterling who was riding on the body of the motor, declared he was not going to ride under the wire. As the loader reached a point under the wire and a distance of six or eight inches from the wire, according to the testimony of most, if not all, of plaintiff's witnesses, the loader was brought to a stop. At this point George Sterling jumped off the loader and took two or three steps towards the rear end of the loader. A. L. Burkhalter testified he "holloed for him not to go around the back and he fell in or was sucked in or something to the sprocket". Bailiff, after bringing the truck to a stop, jumped off on the left side of the truck and walked around to the other side where he saw the body of George Sterling jammed against the loader with his chin right up against the sprocket. Bailiff then got back into the truck and backed it away so as to free the body from its contact with the machine. Sterling was still breathing but by the time he was taken into town he was dead.
At the time of this tragic accident plaintiff, the mother of the deceased, was standing on her porch, probably not more than 50' distant, and witnessed the killing of her son. George Sterling had never been married and had lived with his mother all of his life. It was shown that he contributed substantially to her maintenance and support, although at the time of her son's death she was married to Amos Calton.
Several acts of negligence are charged to defendant as the basis of appellant's suit. For discussion we have grouped the alleged acts of negligence into two main charges: The first is that defendant owned and operated a heavily loaded power line negligently strung and maintained upon poles at an excessive distance apart, and that by reason of such excessive distance between the two poles, the wires sagged so much as to greatly interfere with and endanger those engaged in traveling along the above referred to gravel road, or working about the mill yard. The second allegation of negligence deals with the failure of defendant to properly insulate the wires in question or to place them at a sufficient height to protect the users of log loaders in and about the mill yard. It is alleged officials of the electric company knew sawmills used booms and derricks extending many feet into the air, and that with such knowledge the company should have either raised said lines to a safe height or insulated the wires in order to provide adequate protection to the general public.
In our domestic and industrial progress electricity has played an important part, and its distribution has in recent years carried electric service to remote areas, and we are now as a general rule better informed as to its highly dangerous aspects than in former years. No one can question that a high voltage electric power line is a subtle, invisible, and highly dangerous force and that by reason of this characteristic the very highest degree of care to avoid injury is required of those who make use of such a dangerous agency in their business. The degree of care to be exacted has been variously described and defined by courts and text writers. Acceptable language which seemingly is in strict accord with the jurisprudence *865 of our state is to be found in 18 American Jurisprudence, pp. 443, 446, par. 48: "While the measure of duty resting upon electric companies in order to exonerate them from liability for negligence is expressed by the courts in forms varying from reasonable or ordinary care and diligence to a close approximation to the view that they are insurers, yet the generally accepted rule in such cases, as in determining liability for negligent injuries generally, is that such companies are bound to use reasonable care in the construction and maintenance of their lines and apparatus that is, such care as a reasonable man would use under the circumstancesand will be responsible for any conduct falling short of this standard. The degree of care which will satisfy this requirement varies, of course, with the danger which will be incurred by negligence and must be commensurate with the danger involved. According to numerous decisions, where the wires maintained by a company are designed to carry a strong and powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured, if not killed, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its plant to prevent such injury; * * * The law is complied with when the company provides such a protection as will safely guard against any contingency that is reasonably to be anticipated. The company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated."
See also: Potts v. Shreveport Belt Ry. Co., 110 La. 1, 34 So. 103; Hebert v. Lake Charles Ice, Light & Waterworks Company, Ltd., 111 La. 522, 35 So. 731, 64 L.R. A. 101; Babin v. Sewerage & Water Board of New Orleans, 2 La.App. 517; Ledet v. Lockport Light & Power Co. Inc., 15 La. App. 426, 132 So. 272; Mays v. Southwestern Gas & Electric Co., 174 La. 368, 140 So. 826; Hughes v. Southwestern Gas & Electric Co., 175 La. 336, 143 So. 281; Younse v. Southern Advance Bag & Paper Co., Inc., La.App., 159 So. 611; Freibert v. Sewerage & Water Board of New Orleans, La.App., 159 So. 767; Bynum v. City of Monroe, La.App., 171 So. 116; Webb v. Louisiana Power & Light Co., La.App., 199 So. 451; Scott v. Claiborne Electric Cooperative, La.App., 13 So.2d 524; McMullen v. McClunney, La.App., 23 So.2d 658; Short v. Central Louisiana Electric Co., La. App., 36 So.2d 658; Coulon v. City of Alexandria, La.App., 44 So.2d 171.
The evidence in this case does not raise a question of defendant's wires being out of place. They were exactly as constructed by defendant company and were 23' above the ground and not insulated at the place of the accident. Naturally, the question occurs as to what should be the proper height of such dangerous wires as to reasonably safeguard traffic which has a right to be in the proximity of such wires. We are informed that the State of Louisiana has not by statute regulated the distance that could be declared legally safe, and in the absence of such statutory regulation the court should establish that standard of elevation which, under reasonable circumstances, could be expected to remove danger and provide safety for the public.
This court has on several occasions accepted recommendations of the National Bureau of Standards of the United States Department of Commerce. An official of the defendant company, Mr. Hugh Balfour, a graduate engineer, testified the subject line was constructed in accordance with all recognized standards of electrical construction, particularly those recommended by the National Bureau of Standards of the United States Department of Commerce. He testified that the basic recommended clearance of an electric line of this voltage above a road of this type, is 20' for a span length of 250', which clearance is increased by one tenth of a foot for every foot of span length over 250'. Thus, the regulation required a clearance of only 22.32 feet in this instance. With an actual clearance of 23', defendant's line was actually 8" above the recommended standard.
In Webb v. Louisiana Power & Light Co., 199 So. 451, 453, this court held:
"The Bureau of Standards of the United States Department of Commerce, as is disclosed by the evidence adduced in the instant *866 case, provides safety rules for the installation and maintenance of electrical supply and communication lines. These rules permit the employment of uninsulated wires, such as are involved herein; but require that they have a minimum vertical clearance above the ground of 15 feet where they cross over spaces or ways accessible to pedestrians only. As before shown, defendant's line affords a vertical clearance above ground of more than 24 feet, or 9 feet in excess of the stated minimum; hence there was no violation by defendant of the Federal government's safety requirements.
"It appears to us that defendant fulfilled all legal duties imposed on it. Although the wires in question were not insulated, there was a compliance with the other alternative, namely, the placing of them beyond the danger line of contact with human beings. While engaged in the ordinary course of their affairs, pedestrians would experience no harm from them. Defendant could not have reasonably anticipated that decedent would withdraw from the ground connected well pipe of a length, here more than 30 feet, that would make contact with the transmission line. On the contrary, it could have reasonably expected that in the event of the pulling of the pipe from the well, a disassembling of it, joint by joint, would be the course pursued."
See also: Welsh v. Gulf States Utilities Co., La.App., 32 So.2d 723, and Coulon v. City of Alexandria, La.App., 44 So.2d 171.
A short time after the tragic death of George Sterling defendant erected an additional pole 45' in height at or near the road where the accident happened, thus raising the electric wire some several feet higher. We are of the opinion that defendant's wires were not unduly low as required by fair standards for the purpose of giving adequate protection under the circumstances brought into play in this case. We, therefore, do not construe the act of defendant in erecting an additional pole an admission of negligence. Whether or not other circumstances, as testified by witnesses for the defendant, prompted the erection of the pole is of no matter. Surely, it is a responsibility of the electric company to meet the degree of care toward the public as may reasonably be necessary. There must be, however, some limit to burdens upon construction. Without some limitations the furnishing of electricity would become most impracticable, if not impossible. It is with reason, therefore, that the furnishing of electricity and the operation and maintenance of high voltage lines do not make the electric company an insurer against all accidents which may occur through its operations.
The courts of this state have adopted the view that insulation of overhead wires is not required under all circumstances and that a failure to provide insulation of such wires may not be negligence. Boudreaux v. Louisiana Power & Light Co., 16 La.App. 664, 135 So. 90; Bourgoyne v. Louisiana Public Utilities Company, La. App., 150 So. 68, reh.ref. 152 So. 150; Higginbotham v. Louisiana Power & Light Co., La.App., 198 So. 402, reinstated La.App., 2 So.2d 234; Welsh v. Gulf States Utility Company, La.App., 32 So.2d 726.
Thus, in Boudreaux v. Louisiana Power & Light Co., 135 So. 90, 91, the Orleans Court of Appeal had this to say: "The record establishes the fact that the best modern practice does not require insulation of hightension wires suspended as this one was, about 30 feet from the ground, nor is there any appropriate legislation requiring insulation. It does not appear that any custom or law required the posting of notices of the dangerous nature of the overhead wires and, moreover, the several members of the crew operating the crane were familiar with the danger involved. Consequently, notices and warning signs would have made no difference. It also appears that the power lines of defendant in the vicinity of the accident were constructed in accordance with the requirements of the United States Bureau of Standards. There is, therefore, no proof of any negligence on the part of the defendant * * *."
We note that in a number of cases where failure to insulate was held negligence a city ordinance was involved, as for instance in Haight v. New Orleans Public Service Co., 2 La.App. 405, and Clements v. Louisiana Electric Light Co., 44 La.Ann. 692, 11 So. 51, 16 L.R.A. 43.
*867 We think that the authorities above referred to are appropriate and have application to the facts presented in this case, and it seems clear to us that appellant has failed to demonstrate any negligence arising from the construction, operation or maintenance of the power lines above referred to. In the trial court our learned brother held Sterling's death by electrocution due to his negligence, giving the following excellent reasons therefor:
"The deceased, himself, according to the record in these cases, knew about the danger and had said that he would not ride the truck under these wires with the boom up, and, my opinion is that, at the time he was electrocuted, he was in the act of picking up the iron pin under the sprocket wheel to lower the boom, believing that the boom was not then in contact with the wires overhead. No other reasonable conclusion can be reached, unless he accidentally came in contact with the truck when Smith warned him and he turned to look back, as Smith says he did. He could have accidently contacted the truck, as he turned, but I doubt this. He apparently was not running away from the truck, but along side it. Mr. Bailiff, driver of the truck, and operator of the loader, looked back and he testified that the boom was six to eight inches away from the wires, but there were four wires on the cross arm and the boom may have been in contact with one of these wires that he did not see. Jim Smith, who was looking at the deceased and who called to him to warn him, does not know how he came in contact with the truck. He said it looked like he was drawn into it and counsel for plaintiffs urges that the electricity attracted his body into the truck, but the evidence offered by experts tends to disprove this theory and shows that the electricity could not jump more than a fraction of an inch, disproving the theory that the deceased was drawn into the truck; and another theory of plaintiffs is that the electricity jumped six to eight inches from the wire to the boom of the loader.
"Considering all of the evidence and the entire record in these cases, it appears to me that the deceased was guilty of negligence himself. He knew the dangerous character of these wires and he should have made certain that the boom was not in contact with any of the wires before approaching the truck, after he jumped off and was in a place of safety and was warned by Smith, and, also by his mother, who witnessed his electrocution from a short distance.
"Plaintiff cites Potts versus Shreveport Belt Ry. Co., supra, 110 La. 1, 34 So. 103, on the question of contributory negligence. This case holds that `where a person is employed in the presence of a known danger, to constitute contributory negligence, it must be shown that he voluntarily and unnecessarily exposed himself to the danger.'
"In the present case, my opinion is that the record supports the conclusion that deceased did just that."
Defendant earnestly contends that the exception of no cause or right of action filed on its behalf should be sustained. This exception was referred to the merits by the trial judge, but defendant by way of answer to the appeal has reasserted its validity in this court. We do not think the exception should be sustained. Though there may be serious doubt as to whether in this case a cause of action existed, we are nonetheless confronted with allegations under which evidence could be admitted and that could form the basis for holding the defendant guilty of actionable negligence.
The effect of this judgment is that we do not find that plaintiff has shown actionable negligence in connection with the unfortunate accident which occurred. We likewise agree with the District Judge that because of the known danger and unheeded warnings, the act of George Sterling in leaving a place of safety for one of danger constituted negligence on his part.
This case was consolidated for trial with a similar suit brought by Joe Buddie Sterling, the father of the deceased. The conclusions we have arrived at herein are equally applicable thereto.
The judgment appealed from is affirmed at appellant's cost.
McINNIS, J., is recused.