50 So.2d 823

**BOLIAN v. WASHINGTON–ST. TAMMANY ELECTRIC COOPERATIVE, Inc., et al.**

No. 39627.

Dec. 11, 1950.

Rehearing Denied Feb. 12, 1951.

Arthur C. Watson, City Atty., Russell E. Gahagan, Natchitoches, for appellants.

Gerard F. Thomas, Jr., Natchitoches, for plaintiff-appellee.

Ellis, Ellis & Lancaster, Frank B. Ellis, all of New Orleans, for plaintiff-appellant.

Ott & Watts and France W. Watts, Jr., of Franklinton, Theodore F. Cangelosi, Horace C. Lane, both of Baton Rouge, for defendants-appellees.

FOURNET, Chief Justice.

The plaintiff, Julius E. Bolian, is appealing from a judgment of the lower court dismissing his suit against the Washington-St. Tammany Electric Cooperative, Inc., and its insurer, the American Employers' Insurance Company, to recover the sum of $13,515.20, the value of his residence and contents, allegedly destroyed by a fire caused by the negligent installation of the cooperative company's service connections to his home.

According to the facts as developed on the trial of the case, the plaintiff's five-room house located on U. S. Highway No. 190 near Slidell, Louisiana, was destroyed by a fire that occurred around 5:30 p. m. on September 4, 1947, during one of the worst thunder and electrical storms in the experience of the residents of this locality. This house, completed in January of 1947 at an approximate cost of $9,000, was constructed entirely of new materials. Its foundation was of concrete reinforced with steel and all of the framing throughout was of cypress, including the chain wall running from the foundation to the roof. The walls were finished on the outside with white asbestos siding and the interior with fire proof sheet rock. The roof was of aluminum, the only roofing material available at the time. The cooperative company furnished the plaintiff with electricity. At the time his service connection to the cooperative's main power line was installed, the company's line foreman inspected and passed, as up to required standard specifications, the meter pan and switch box at the residence, and before these connections were permitted to be hooked to the REA outlets, all of the wiring and electrical installations in the residence itself were approved by the government inspector.

At the time the fire started no member of the plaintiff's family was at home, and had not been for at least an hour and a half. The fire was discovered a short time after a severe clap of thunder by someone traveling along the highway who stopped at the grocery store operated by David Herrin, approximately a mile away, and told him the first white house down the road was on fire. He left immediately in his car, thinking the house referred to was that of other neighbors, Mr. and Mrs. Felix McKean, who went with him to the plaintiff's house.

According to the testimony of these three witnesses, who were the first to reach the scene, the fire began in the northwest corner of the rear bedroom at the place where the switch box on the inside wall connected with the meter on the outside, to which meter the service lines of the coop-

erative company were joined. McKean, the first to enter the rear bedroom, from which smoke and fire were pouring, stated the fire was then burning through the wall around the meter box and from the meter box "right on up through the top of the house;" that the whole side "was going up in fire." The evidence also establishes the fact that although desperate efforts were made to extinguish the fire and save some of the furnishings, this was rendered impossible by the small supply of available water and the inadequacy of the equipment at hand. The ice box, kitchen stove, and one or two other articles, mostly from the kitchen, were the only things salvaged.

It is the plaintiff's contention that under the National Safety Code it was the duty of the cooperative company, engaged in the business of furnishing electrical power and current to individual consumers, to so safeguard their power lines and service connections by the installation of ground wires, lightning arresters, dividers, and other similar appliances that the property being serviced will be protected against the dangers inherent in the discharge over these lines of the accumulation of excessive heat generated by lightning and other atmospheric conditions, and having alleged and shown that the fire that destroyed his home was directly traceable to an atmospheric disturbance in the nature of an electrical storm that struck the cooperative power line and sent the attendant combustible heat and energy into the meter and electrical wiring attached to the meter and the switch box, causing the complete destruction of the house and its furnishings in the resulting fire, he has made out a prima facie case of negligence on the part of the cooperative company, and that inasmuch as the defendants have failed to discharge their burden of proving the cooperative company was free from negligence in its installation of these safety devices, he is entitled to recover for this damage under the doctrine of res ipsa loquitur. In any event, he contends he has established his alternative allegations of gross negligence and want of due care on the part of the power company in the proper insulation of its lines and service connections by the grounding of the transformer on the main line immediately opposite his property, in which transformer the high voltage of 7,200 units carried over the main line is reduced to 120 volts before it is permitted to flow through the secondary wiring system into his home.

The defendants contend, on the other hand, in which contention they have been upheld by the trial judge, that inasmuch as it is of the essence of the applicability of the doctrine of res ipsa loquitur that the thing which caused the injury be under the control and management of the defendants, the plaintiff has not made out a prima facie case of negligence because he alleges in his petition his house was destroyed by fire resulting from a lightning discharge or atmospheric disturbance, acts of God over

which the defendants had no control and for which they cannot be held accountable unless it be shown these acts combined and concurred with the negligence of the cooperative company to produce the injury, a fact the plaintiff has failed to establish by a preponderance of the evidence.

It is admitted by the witnesses for both the plaintiff and the defendants that if the transformer, at the point where the secondary system carrying electrical power to the plaintiff's house began, was properly grounded and properly connected to the "hot line" (the primary or main line over which the power from the company was carried to its consumers) and the second or "neutral line" (the lower wire used to complete the circuit on both the main and secondary systems), the service connection to the plaintiff's residence would have been properly installed under the requirements of the National Safety Code. They also conceded that if this ground wire was not present on the pole of the main distribution line at this point, then the requirements of the National Safety Code would not have been complied with and the resulting installation would have been a faulty or "unsafe" one, constituting negligence on the part of the cooperative company.

The expert witnesses further established that while the primary object in installing a ground wire at the transformer from an electrical standpoint is to offer protection against lightning by providing an easy ground or outlet for the excessive voltage applies to these wires from this source, the wire serves the two-fold purpose of protecting life and property. The technical explanation is to the effect that inasmuch as electricity seeks to reach and come to rest at the point of least resistance, if there is no point of least resistance established at the transformer through the installation of a ground wire, the excessive electrical charges and tremendous energy generated by atmospheric disturbances are not grounded at that point but are, instead, transferred from the transformer to the "neutral" wire on the main system and over this wire into the service drops in the nearest house, causing a minor explosion sufficient to ignite any material of a combustible nature. In the words of B. Z. Segall, a mechanical and electrical engineer of many years experience and recognized nationally as an expert in his field, while the excessive voltage generated by these atmospheric disturbances is, on infrequent occasions, transferred from the neutral wire to the common neutral along the pole line, as a matter of actual experience "for some reason or other it will pick the secondary going into a residence or something of that sort. For some reason the resistance of the path toward a house seems to be less than the resistance to some other grounds on the primary system."

In support of his contention the plaintiff testified that while he was fixing up the garage or wash shed in the rear of his home, and which had been untouched by

the fire, the next day, Lyle V. Killingsworth, line foreman of the cooperative company at the time the service connections were installed and also at the time of the fire (since made manager of the company), came to his place to check-up and also to make new connections to this shed; that while there he stated, in the presence of the plumber who was also on the premises for the purpose of providing new facilities in this make-shift home, that he had investigated and found there was no ground wire on the pole holding the transformer and that he had "fixed it up" so that it would not cause any further trouble. The plaintiff states he himself investigated the morning after the fire and found no ground wire on this pole. His testimony with respect to the absence of a ground wire on this pole at the time of the fire is not only corroborated by Joe Facianne, the plumber who heard the conversation between the plaintiff and Killingsworth, but also by Paul Pettit, a neighbor who had had electrical experience during a period of employment by the Municipal Power Company of Yazoo City, Mississippi, and Henry Henderson, line foreman for the Gulf Public Service Company, servicing the nearby town of Slidell, Louisiana, who was called to the scene during the fire to cut the wires on the secondary system because they had been parted from the meter connection and had fallen across the metal fence surrounding the house and were electrically charging it. While an effort was made to discredit the testimony of Henderson in this respect, by questioning him with reference to a statement purportedly made to a representative of the defendants some four months after the fire, the import of which was that he did not know whether there was a ground wire on this pole, the statement in its entirety is not in the record, and Henderson explains that by such words he meant he did not know at the time he was being questioned—in January of 1948—whether there was *then* a ground wire on the pole.

We are not impressed with the testimony offered by the defendants to overcome this positive testimony on behalf of the plaintiff. They offered as witnesses seven of their employees, one an engineer in charge of all material and the records of that taken out on jobs, the other six linesmen, all members of the three three-men crews employed by the cooperative at the time plaintiff's service connections were made. The impression created by this testimony is that the ground wire must have been installed on the pole holding the transformer servicing the plaintiff's house because they always tried to do their work in accordance with specifications calling for such installation, they did their job well, and they knew their work was subject to government inspection.

All of these men claimed they actually assisted in some part of the installations at plaintiff's home, but they could give no sound explanation as to why it was neces-

sary for all of the linesmen then in the employ of the cooperative to work on this particular connection. Their only reason for remembering the plaintiff's project is that they ate some pecans in his yard, but they could remember in detail nothing about the installation of some 500 similar connections made since the time plaintiff's were made. It is to be observed, further, that the remaining members of these three crews, no longer in the employ of the company, were not called to testify, although the addresses were known and it was established one of them lived in the town of Covington, where the trial was held, while another lived close by.

The argument of the defendants that recovery can only be had in this case after the plaintiff has shown the fire was actually caused by a defective installation and has excluded the possibility it was caused by a cigarette, a defective stove, a bad iron or cord, or a rat, is without merit. There is no evidence in the record from which an inference, and much less a conclusion, can be drawn that the fire could have been caused by any of these. On the contrary, as just above demonstrated, from the evidence in the record the conclusion is inescapable that the fire started in and around the meter box.

Having reached this conclusion, it is unnecessary for us to discuss the doctrine of res ipsa loquitur in relation to this case.

There seems to be no dispute as to the valuation placed on the house and its contents in plaintiff's petition, and no evidence was offered by the defendants during the trial of the case to contradict the testimony given by the plaintiff to sustain these allegations. In fact, this point is not even discussed in the brief of the defendants.

For the reasons assigned, the judgment appealed from is annulled and set aside and it is now ordered that there be judgment in favor of the plaintiff, Julius E. Bolian, and against the defendants, Washington-St. Tammany Electric Cooperative, Inc., and the American Employers' Insurance Company, jointly and in solido, in the sum of $13,515.20, with legal interest from judicial demand.