HALL, Judge.
This is a suit for damages resulting from personal injuries received by Mrs. T. W. Green when the telephone service line leading to her home was struck by lightning while she was using her telephone. Plaintiffs are Mrs. Green and her husband. Defendant is Insurance Company of North America, liability insurer of Central Louisiana Telephone Company, which installed and maintained the telephone in plaintiffs’ home.
Defendant appealed from a judgment rendered in accordance with a jury verdict awarding Mrs. Green damages in the amount of $10,000 and Mr. Green $1,000 for medical expenses. After a careful re *427 view of the evidence, it is this court’s conclusion that there is insufficient evidence to support a finding of fault on the part of the telephone company. Therefore, the judgment of the district court is reversed and judgment is rendered in favor of defendant rej ecting pláintif f s’ demands.
Plaintiffs’ home is in a rural area in Franklin Parish near Wisner. Telephone service in the area is provided by Central, the Greens’ telephone service having been installed in 1959.
The main telephone line runs along the highway in front of the Green residence. From the nearest telephone pole . on the main line, a service or drop line leads to the west side of the residence, running through the branches of a large pecan tree in the front yard.
Although the Greens had some complaints about their telephone service and had called Central’s maintenance man in the area the night before the accident to check their telephone, the telephone was working properly for both ingoing and outgoing calls on the morning of the day of the accident.
On the afternooon of July 28, 1971, Mrs. Green, while seated on a metal butane space heater in the living room, placed a long distance call. She was holding the receiver-transmitter to her left ear with her right hand. She had been talking to the operator and the telephone was working properly. The operator left the line and Mrs. Green leaned over to “jiggle” the button on the cradle of the telephone which was on the .floor. This was the last thing she remembered, but the evidence shows at this same time a bolt of lightning struck the pecan tree and severed the service line at the point where it passed through the branches of the tree.
Mrs. Green rose up off the space heater, fell backward, hit her head on a television set and fell to the floor, unconscious. She was taken to the hospital in Winnsboro where she was examined in the emergency room by Dr. Hollis T. Rogers, Jr., a specialist in internal medicine. Dr. Rogers’ examination revealed what appeared to be a bruise or burn on the left side of the face. Mrs. Green had some welts or raised, reddened area on her chest which did not appear to be burns, but were like hives. Her vital signs were normal. An electro-cardiogram was taken and was normal, indicating she had not received an electrical shock passing through the heart as might be expected in a patient who had been struck by lightning.
Mrs. Green wanted to go to Monroe to see her regular doctors, Drs. Yancy, Holder and Wade, so she was sent on to the Glenwood Hospital in Monroe. She was seen at the hospital oii July 30, the second day after the accident, by Dr. Warren J. Stassi, a specialist in otorhinolaryngology —primarily ear, nose and throat, at the request of Dr. James Wade. It is to be noted that Dr. Wade did not testify and the record contains no explanation of why he was not called as a witness.
Dr. Stassi found that Mrs. Green had a ruptured ear drum and was having a san-guineous — blood mixed with mucus — discharge from the left ear. There was no evidence of basal or skull fracture. There was no evidence of burns about the ear or any other part of her body. The ear drum had a “tremendous hole” in it and the doctor was of the impression some sort of force had produced the injury. It was the kind of injury seen frequently in an individual who has been swimming or who was suddenly cuffed on the ear and was the kind of injury he had seen in other patients struck by lightning. It could have occurred from an electrical shock or any other type of severe force. Dr. Stassi was of the opinion the injury was caused by the electrical force of the lightning. Mrs. Green had a conductive loss — damage to the ear drum — and a nerve loss, resulting in a permanent impairment of hearing in her left ear. The injury was extremely painful. She was treated for several months.
*428 Plaintiffs contend that as Mrs. Green was using the telephone, a bolt of lightning struck the pecan tree and service wire causing an electrical charge to come through the telephone line, enter the telephone set and come through the receiver, knocking Mrs. Green unconscious and permanently damaging her left ear. They claim the telephone equipment was defective; that Central was negligent in maintenance of the system and that, but for the defects and improper maintenance, the electrical current from the lightning would not have entered the telephone set and Mrs. Green would not have been injured. Specifically, plaintiffs’ petition charges Central with the following acts of negligence: (1) failing to provide adequate safety equipment to prevent such electrical shocks as sustained by plaintiff; and (2) failing to adequately maintain and keep the telephone equipment in a good state of repair. On appeal plaintiffs particularly emphasize the location of the service line through the branches of the pecan tree as an act of negligence on the part of Central.
Defendant denies there was any defect in the equipment; denies all charges of negligence and improper maintenance; contends the telephone system was equipped with adequate safety devices meeting the highest standards; and contends Mrs. Green’s injuries were a result of an “Act of God” for which Central and its insurer are not responsible.
There is a scarcity of Louisiana jurisprudence dealing with the duties and responsibilities of telephone companies. Nevertheless, both parties agree that there can be no liability without fault on the part of the telephone company. Certain guiding principles of law can be drawn from the few Louisiana cases dealing with liability of telephone and power companies, from similar cases decided in other states, and from general tort law.
A telephone company is not an insurer against injuries sustained by its subscribers or,other persons while using its equipment. Such a company must use reasonable and ordinary care under the circumstances to protect such persons from injury, and are not liable for injuries sustained unless guilty of some wrongful or negligent act or omission — that is, fault.
A telephone company’s duty is complied with when the company provides such protection as will safely guard against any contingency that is reasonably to be foreseen or anticipated. It is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated.
Lightning striking a telephone line is an occurrence that can reasonably be foreseen or anticipated. Therefore, reasonable care must be exercised to afford protection to a user of a telephone from injury by lightning or atmospheric electricity conducted by or in the telephone wires.
Such protection should be afforded by the installation and maintenance in good working order of adequate and practicable known safety precautions and devices meeting the highest standards of science, as applied to the telephone industry.
A telephone company is not liable for an injury caused by lightning, an Act of God, that occurs notwithstanding due care on the part of the company.
See Bolian v. Washington — St. Tammany Electric Coop., 218 La. 734, SO So.2d 823, 25 A.L.R.2d 716 (1950); Burdett v. Southern Bell Tel. & Tel. Co., 72 So.2d 595 (La.App. 1st Cir. 1954); Calton v. Louisiana Power & Light Co., 56 So.2d 862 (La.App.2d Cir. 1952) affirmed 222 La. 1063, 64 So.2d 432 (1953); Short v. Central Louisiana Electric Co., 36 So.2d 658 (La.App.2d Cir. 1948); McMullen v. McClunney, 23 So.2d 658 (La.App.2d Cir. 1945); Scott v. Claiborne Electric Cooperative, 13 So.2d 524 (La.App.2d Cir. 1943); Schultz, et al. v. Baton Rouge Electric Co., 7 La.App. 401 (1st. Cir. 1927); 29 C.J.S. *429 Electricity § 38 et seq., p. 1056. See also the annotations “Liability of an Electric Power or Telephone Company for Injury or Damage by Lightning Transmitted on Wires,” 25 ALR 2d 722 (1952) and “Liability of Telephone Company For Personal Injuries Resulting From Excessive Sound Over or On Telephone,” 85 ALR 2d 838 (1962).
The evidence clearly established that the injury to Mrs. Green was caused by a force generated by the lightning which entered the service line and was transmitted through the telephone system into Mrs. Green’s ear. The critical issue is whether the telephone company, in accordance with the standards set forth above, met its duty of exercising reasonable care to protect Mrs. Green from injury by reason of lightning striking the telephone line.
Defendant presented evidence as to the kind of equipment serving the Green residence, how it functioned, and its condition at the time of the accident.
The main telephone line, which is not insulated, is mounted overhead on wooden telephone poles and runs along the edge of the highway. From a telephone pole located at the northwest corner of the Green yard, an insulated service line or “drop” line conducts the electrical current to the west side of the house, where it is connected to a glass insulator. This wire then runs vertically down the side of the house to a “house protector” or lightning arrester device which is a metal box containing fuses and carbon blocks. The drop wire is connected to this device which in turn is connected to an uninsulated copper wire which leads to and is connected with a copper rod five feet in length which is driven into the ground to form the “ground” connection and protection. Another wire, the house line or house wire, leads from the house protector into the house, where it is connected with the base plug. Another wire runs from there to the telephone hand set.
The purpose of the house protector and the ground rod is to “bleed off” excessive amounts of electricity, including that caused by lightning, into the ground, rather then to allow it to enter the house and telephone set. When excessive voltage enters the house protector, it arcs between the carbon blocks and is diverted into the ground system. For current to enter the house line, it must pass through two fuses in the house protector and excessive voltage will cause the fuses to blow.
The telephone operated on a “ring to ground” system, that is, the ground system must be properly connected and functioning in order for the telephone to ring. Incoming calls were received on the Greens’ telephone on the morning before the accident, indicating that the ground system was properly connected and working.
William Watkins, the installation, repair and maintenance man for Central in the Wisner area received a call to go to the Green residence during the afternoon after the accident. He found the drop line was broken at the tree which was about half way between the telephone pole and the house and he replaced it. In order to hook the new drop line to the house protector, he removed the lid of the protector and made the connection. In the course of this procedure he visually examined the fuses and carbon blocks and they appeared to be in good working order. He examined the ground wire and ground rod and their connections to the house protector and all seemed to be in proper working order. He tested the ground equipment and the house protector and found them to be working properly and properly connected to each other.
Inside the house he found the telephone was not working- There was no visible damage to the telephone. No part of the telephone set appeared to be burned, melted or fused. He took out the existing telephone and put in a new telephone set, after *430 which the telephone worked. The baseboard plug or connector box appeared to be in good order and none of the wires leading from the telephone set to the connector box were melted in any way.
The removed telephone set and service line were preserved. At a later time, the house protector, ground wire and ground rod were removed from the premises and preserved. All of these items of equipment were offered into evidence at the trial.
J. E. Thompson, Central’s area plant manager with experience in maintenance and repair of telephones, opened up the bottom of the telephone set and examined it. There was no visible sign of any damage or evidence of burning, melting or fusing of the parts. Thompson testified the equipment in use at the Green residence was standard telephone equipment, complying with the highest standards in the industry.
Robert Newsom, president and general manager of Central, with a degree in electrical engineering and many years experience in all phases of the telephone industry, also examined the telephone set. He found no physical evidence of any excessive electrical charges getting through the unit. He was of the opinion that if lightning of any magnitude had actually entered the set, there would be evidence thereof such as burned wires, cords or other parts visible to the naked eye. Newsom testified that if there were something wrong with the fuses or carbons in the house protector, it would cause an interruption in service. He testified that the equipment in use was standard throughout the industry and met the highest standards of the industry. He explained that the house protector is designed as an “aid” in stopping excessive current from entering the house, but he knew of cases where the protectors failed to completely stop such current.
The equipment removed from the Green residence was examined by two independent,’ well-qualified experts, D. Z. Segall and Robert Newall.
Segall is a registered professional engineer currently self-employed as a consulting engineer in New Orleans. He has extensive experience in electrical engineering and experience in the field of telephones. He has testified as an expert in many cases over a period of about 35 years.
Segall examined and tested the equipment. He found the set to be “dead” and determined the reason to be because the circuit in the receiver had “opened up”. This could have been caused by lightning. Otherwise, the set and all of the wiring had its full integrity. The auxiliary protector in the receiver, designed as an adjunct to the house lightning arrester to drain off extraneous voltage was operative. He found the house protector to be in good operating condition. The fuses were intact and the carbon blocks were effective. The carbon blocks showed evidence of lightning having passed through them, which is their purpose and does not render them inoperable, but indicates they worked properly. He found nothing to indicate the house protector was defective or failed to operate. Segall testified this type of house protector is standard in the indus-ry, meets the highest standards of the industry, and is approved by Underwriters Laboratory. He further identified the method of grounding as standard in the industry and approved by the National Safety Code and National Electrical Code.
Segall was of the opinion the drop line was severed by lightning. There was a small break in the outer insulation about a foot from where the line was severed, but the inner insulation around each of the two wires was intact. Otherwise, the line had full integrity from the point where it was severed to the end leading to the house.
Segall expressed the opinion that Mrs. Green’s injury resulted from an “acoustic shock”, a sonic effect and mechanical force as distinguished from electrical force. He *431 explained the explosive sound created by lightning could be transmitted into the receiver causing a terrific noise and painful injury. The house protector is not designed to protect against excessive sound, as distinguished from electricity, and science has not developed a device to protect against such sonic phenomena.
Newall is a professsor of electrical engineering at Louisiana Tech and holds B.S. and M.S. degrees in electrical engineering. His findings based on examination of the equipment were substantially the same as Segall’s. The open circuit in the receiver was probably caused by voltage exceeding normal operating voltage, but he found no evidence of heavy or significant amounts of current entering the telephone set. He was of the opinion the house protector operated as intended and limited electric pressure or voltage to a reasonably safe value. Newall explained that a house protector cannot keep all electrical current out of the house — as some electrical current must flow through to keep the telephone in service — but serves to limit the amount of current. The electrical energy or current in the lines is converted into acoustical energy or sound by the receiver of the telephone. Sound or movement of air or air pressure is transmitted into the ear. When lightning, which can measure from 100 million to 1 billion volts, strikes á telephone line near a house, a very loud noise or sound from the receiver is to be expected and cannot be eliminated under present methods of telephone service. Newall was of the opinion the telephone company did what could be expected of them, the equipment operated normally, and that the lightning stroke itself did not enter the house but was diverted into the ground.
Plaintiff argues particularly that the telephone company was negligent in allowing the service line to run through the branches of the pecan tree and that some of the insulation had been rubbed away by contact with the branches. The evidence shows it was the usual policy of the company to keep lines away from trees which was not done in this case.
The evidence further shows, however, that the purpose of keeping lines away from possible contact with trees or other objects is to prevent contact which might result in an interruption of service. There is no evidence that the location of this line near the tree made it more likely that the line would be struck by lightning. There is positive testimony by the expert witnesses that even if the insulation on the service line was rubbed off — which fact is not established — it would not make it more likely for lightning striking close by to get into the line. The purpose of insulation is to protect the wires from direct contact with objects such as branches and to provide strength to the line — not to protect against lightning. Thus, it is to be concluded that the location of the service line through the branches of the pecan tree had no relation to the risk of lightning and no causal connection with the accident which occurred in this case.
Plaintiffs deny that the telephone equipment offered into evidence and examined by the experts was the same equipment in use at the Green residence on the day of the accident. We find, however, that defendant’s evidence identifying the equipment and tracing the chain of possession from its removal from the residence, into the hands of the experts, and into the courtroom, is entirely convincing.
It is this court’s duty to review both the facts and the law. We conclude that the equipment installed at the Green residence, particularly the house protector and ground system, met the highest standards of science as applied to the telephone industry and were in good working order at the time of the accident. The company met its duty to exercise due and reasonable care to protect a user of its telephone equipment from injury by lightning striking the telephone line. Obviously, the equipment was not foolproof or accident-proof because it did not prevent the injury, *432 but the law does not require perfection beyond the limits of scientific knowledge and practicability as applied to the industry. There was no negligence or fault on the part of the telephone company and, therefore, the company and its insurer are not liable.
For the reasons assigned, the judgment of the district court is reversed and there is judgment in favor of defendant and against plaintiffs, rejecting plaintiffs’ demands. All costs, .including the cost of appeal, are assessed to plaintiffs.
Reversed and rendered.